# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-1672

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Eastern District of Missouri |
| Qusai Mahasin, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: November 19, 2003

Filed: April 7, 2004

_____

Before LOKEN, Chief Judge, and McMILLIAN and BEAM, Circuit Judges.

_____

McMILLIAN, Circuit Judge.

Qusai Mahasin ("Mahasin"[1]) appeals from a final judgment entered in the United States District Court[2] for the Eastern District of Missouri upon a jury verdict

_____

[1]The name "Mahasin" herein will refer to the appellant, Qusai Mahasin. Relatives of Qusai Mahasin who have the same last name will be identified by their full names.

[2]The Honorable Stephen N. Limbaugh, United States District Judge for the Eastern District of Missouri.

finding him guilty of one count of possession of heroin with intent to distribute, one count of possession of a firearm during and in relation to a drug trafficking offense, one count of attempted murder of a federal witness, and one count of possession of a firearm during a crime of violence. Mahasin was sentenced to 612 months imprisonment and five years of supervised release, and he was ordered to pay $400.00 in special assessments and $2,345.15 in restitution. United States v. Mahasin, No. S1-4:02CR4 (E. D. Mo. Feb. 28, 2003) (judgment). For reversal, Mahasin argues that (1) the district court abused its discretion in admitting into evidence recordings of telephone calls he placed while in jail awaiting trial, (2) the district court erred in permitting a witness to invoke his Fifth Amendment privilege after being subpoenaed by the defense to testify at trial, (3) the district court plainly erred in handling communications it received from the jury during their deliberations, and (4) the evidence presented at trial was insufficient as a matter of law to support the jury's verdict. For the reasons stated below, we affirm.

Jurisdiction was proper in the district court based upon 18 U.S.C. § 3231. Jurisdiction is proper in this court based upon 28 U.S.C. § 1291. The notice of appeal was timely filed pursuant to Fed. R. Crim. P. 4(a).

## Background

The following is a summary of the pertinent background facts based upon the evidence presented at Mahasin's trial viewed in a light favorable to the jury's verdict.

Facts related to the events of April 6, 2000

On April 6, 2000, in St. Louis, Missouri, Ben White ("White") was driving home from school in a white Camaro when he encountered Mahasin, an acquaintance, driving a minivan. The two talked briefly, then White parked his car and got into Mahasin's car, and together they went to get something to eat. They next

proceeded to Mahasin's house, where they picked up another acquaintance, Nakia Henderson, and drove to Henderson's house. When they stopped in front of Henderson's house, a police car driven by Officer Demetrius Hatley of the University City (Missouri) Police Department pulled up behind them with its dashboard lights flashing. Officer Hatley had intended to issue a citation for a traffic violation. As Officer Hatley approached the minivan, he could see in the rear view mirror the face of the driver, whom he recognized as Mahasin. He also observed White exiting from the passenger side of the minivan and instructed White to get back into the car. White got back into the vehicle, and it sped away. Hatley pursued the minivan in his patrol car. When they were near the intersection of Sadler Avenue and Crest Avenue, Officer Hatley observed White jump out of the minivan, throw a bag and an object appearing to be a gun into a fenced yard, and then run off. Meanwhile, the minivan sped away. In the interests of safety and preservation of evidence, Officer Hatley retrieved the two items. One was a plastic bag containing 529 grams of heroin in several smaller bags, and the other was a handgun in working condition with the serial number defaced. The minivan was later found abandoned and was impounded by the police. It was claimed by Mahasin's mother, Zakiyyah Mahasin, who provided proof of ownership.

White was apprehended and arrested shortly thereafter. He was taken to the University City Police Department, where he refused to make a statement. The next day, April 7, 2000, White provided federal agents with the following handwritten statement.

> I left school around 12:45 and ran into Q He had asked me where I was headed I said no where right now. so he said I might as well ride with him to get something to eat so I got in the car and went to Jack in a box. After getting something to eat he went home. And picked up a this girl and on the way of dropping her off we was pulling up to her house I step out of the car. I told him that he was getting pulled over and he told me to run and tried to hand me the bag. I said what, he said run, I said what,

he said get in the car. When I got in he pulled off very fast. And told me several times to get out in run with the bag. so he hit a corner and said get out now. I was in shock that he had gave me the bag and throw the bag out as I fell out the car and the gun fell out to from under the sit. so I saw the gun in the street and through it. I was running home and the police got me.

Government Trial Exhibit 8.

White was charged by criminal complaint in federal court with possession of heroin with the intent to distribute. However, this criminal complaint against White was later dismissed. After his arrest on April 6, 2000, White no longer associated with Mahasin.

On December 19, 2001, White testified before a federal grand jury regarding the events of April 6, 2000. His testimony was consistent with the handwritten statement he had provided to federal agents on April 7, 2000. On January 2, 2002, the grand jury indicted Mahasin on charges of possession with intent to distribute more than 100 grams of heroin and possession of a firearm in furtherance of a drug trafficking crime.

Mahasin was arrested on March 15, 2002, and arraigned on March 22, 2002. On March 25, 2002, the government provided Mahasin's attorney discovery materials. Included in those materials was the handwritten statement that White had provided federal agents on April 7, 2000.

Facts related to the events of April 18, 2002

In the early afternoon of April 18, 2002, White was at his family's home at 1465 Partridge in University City, preparing to take his dog to the veterinarian. He first moved his brother's car, which was parked across the street, to the same side of

the street as his house. While doing so, he observed a man whom he did not recognize down the street in front of the home of Brenda "B.J." Royston. Brenda Royston was the girlfriend of Mahasin's uncle, Salidin Mahasin, and White had previously seen Salidin Mahasin around Royston's home. After parking his brother's car near the front of his house, White went to his back yard to retrieve his dog. White then observed the same man behind a bush near the front of his house. He waited for the man to walk past his house and then exited his back yard with his dog. As White proceeded down his driveway, the man turned back and approached him. The man – later identified as Maurice Rose ("Rose") – began chatting with White about the dog and playing with the dog. White asked Rose if he lived nearby, and Rose indicated that he had a girlfriend who lived nearby. White indicated that he had to go. Rose asked "What's your name, man?" and White replied by giving his real name. Rose turned to his right, and then turned back, pointing a gun directly at White. White dropped the car keys and turned to run away, with his arms covering his head. He was shot several times in the arms and back and fell to the ground unconscious. White regained consciousness and managed to get back to his porch, where he collapsed. White's father and brother rushed out of the house and found him on the porch. His brother called 911. Shortly thereafter, paramedics arrived, and White was taken to the hospital by ambulance. White underwent surgery twice on April 18, 2002, and a third time on April 22, 2002.

At the time of the shooting, nothing of value had been demanded or taken from White. The dog had run away and later that day was returned home. An individual named Brad Troutman had been doing yard work at his friend's house at 1516 Partridge at the time of the shooting. Troutman heard the gunshots and, moments thereafter, observed a gray minivan speeding away. He reported his observations to the police.

Detective Daniel Brady of the University City Police Department began investigating the shooting shortly after the 911 call was received on April 18, 2002.

He learned that White was a witness in Mahasin's case and that Mahasin's uncle, Salidin Mahasin, occasionally stayed with Brenda Royston and her two daughters at 1511 Partridge. Detective Brady went to the Royston home, where he found and interviewed one of Brenda Royston's daughters, Brittany. Brittany provided a description of a gray van which Detective Brady suspected was connected to the shooting.

Detective Brady received information that Salidin Mahasin had moved into the residence at 4938 St. Louis Avenue, the home of Zakiyyah Mahasin. Detective Brady went to 4938 St. Louis Avenue and found Salidin Mahasin at the home, but was unable to obtain additional information from Salidin Mahasin. Detective Brady also ascertained the description of the shooter which White had given to police officers immediately after the shooting. White had described the shooter as a thin, dark-complected young black man, possibly with acne, approximately 5'8" tall, and wearing a gray shirt and a black "do-rag."

On April 19, 2002, Detective Brady obtained from the St. Louis Police Department names of, and information about, three known associates of Mahasin. Detective Brady also obtained a color photograph of each of the three individuals. Among them was Rose, also known as "Rese" or "Reece Brown." Rose's address of record was 4938 St. Louis Avenue. Detective Brady then selected three more color photographs of individuals who were unrelated to the case but fit the description black male, age 18-25, dark complexion. Detective Brady created a photographic line-up which uniformly displayed the six photographs without any identifying marks. Rose's picture was in position number three. In one of the photographs of a Mahasin associate (not Rose), the individual was wearing eyeglasses.

On April 20, 2002, Detective Brady visited White in his hospital room with the hospital's permission. Both of White's parents were present in the room. Detective Brady showed White the photographic line-up and asked White if he could identify

any of the six individuals as the shooter. Detective Brady cautioned White that he was not obligated to make an identification and that the shooter was not necessarily among the individuals represented. White promptly identified Rose as the shooter. Because White was unable to write due to his injuries, his father initialed Rose's picture. Detective Brady contacted the St. Louis area dispatcher and had Rose's name posted as "wanted."

On April 21, 2002, three days after the shooting of White, Mahasin was visited at the St. Genevieve County jail by Rose and two females, one of whom was Mahasin's girlfriend, Valerie Booker. The jail required all visitors to sign in. Rose signed in under the name Maurice Rose and provided the address 4938 St. Louis Avenue. After the three visitors left, the deputy on duty alerted the St. Genevieve dispatcher that Rose had not presented a valid license at the time he signed in. Shortly thereafter, Rose was pulled over and cited for driving without a valid license. At the time, he was driving a gray minivan registered to Zakiyyah Mahasin, with Missouri license plate number 057NLY.

On April 23, 2002, Detective Brady obtained records provided by the St. Genevieve County jail regarding individuals who had visited Mahasin. Based upon that information, Detective Brady went to the home of Valerie Booker, at 7103 Lexington. When he arrived at that location, Detective Brady observed a gray minivan parked in the driveway. Detective Brady took several photographs of the gray minivan and later showed the photographs to Brad Troutman. Troutman positively identified the vehicle as the one he had seen speeding away on the day of the shooting. That gray minivan had Missouri license plate number 057NLY.

On April 23, 2002, Mahasin was brought to federal court for a status conference in his criminal case related to the events of April 6, 2000. Mahasin was accompanied by Deputy United States Marshal Pat Schulze. During the status conference, Rose and a young black female sat in the courtroom. Rose was wearing

a do-rag, and Shulze asked Rose to remove it. Schulze was aware of the outstanding "wanted" posting for Maurice Rose. She asked Mahasin several times after the status conference concluded who the man in the courtroom was (referring to Rose), but Mahasin would not answer. She then approached Rose outside the courtroom, asked him for some identification, and – upon his production of a driver's license bearing his real name – placed him under arrest.

Procedural background

As stated above, Mahasin was initially indicted on January 2, 2002, based upon the events of April 6, 2000. However, after Rose's arrest on April 23, 2002, Mahasin and Rose were charged as co-defendants in a four-count superceding indictment. The first two counts charged Mahasin with possession with intent to distribute more than 100 grams of heroin and possession of a firearm in furtherance of a drug trafficking crime, both related to the events of April 6, 2000; the third and fourth counts charged him with witness tampering and possession of a firearm during a crime of violence, both related to the events of April 18, 2002.

Mahasin's and Rose's cases were severed for trial. Mahasin's case proceeded to trial on December 9, 2002. At trial, the government's witnesses included Officer Hatley, Ben White, Brad Troutman, Detective Brady, and many others. Over defense counsel's objections, the government was allowed to play for the jury recordings of several telephone calls placed by Mahasin during his incarceration in the St. Genevieve County jail. While the jury listened to the recordings, they were allowed to follow along using typewritten transcripts provided by the government.[3] The administrator of the St. Genevieve County jail, Chris Joggerst, identified

_____

[3]The district court instructed the jury that these typewritten transcripts were not evidence and that the recordings themselves were the primary evidence of their own content. Trial Transcript, Vol. III, at 27.

-8-

Mahasin's voice on the recordings and testified that he knew Mahasin to sometimes use the name "Rico." A St. Louis County police detective, Joseph Nickerson, identified Rose's voice on the recordings where appropriate and testified that he knew Rose to sometimes use the name "Rese" or "Reece Brown." The recordings also included statements by individuals whose voices were not identified but were purportedly friends or associates of Mahasin, including Valerie Booker, Ron Riggins, and an individual referred to as "Gas."

The following is an excerpt from the government's transcript of a telephone conversation between Mahasin and Valerie Booker on April 1, 2002.

> Q [Qusai Mahasin]: . . . Old Rese still uh ridin around and shit?
>
> V [Valerie Booker]: Um, he was up with Charise house not too long ago but yeah yeah he steady runnin around.
>
> Q: Still doin the same thing huh?
>
> V: Mm hmm.
>
> Q: That's a fuckin shame. Hello?
>
> V: Yeah.
>
> Q: Yeah. That motherfucker ain't no good.
>
> V: Who?
>
> Q: Rese. Ain't no good. I'm going to have to reprogram White myself. Yeah.

Government Trial Exhibit 31A at 11.

The following is an excerpt from the government's transcript of a telephone conversation between Mahasin and Rose on April 2, 2002.

Maurice Rose (Rese): Hello?

Unidentified voice: Hey shorty.

Q [Qusai Mahasin]: Hey hello.

Rese: What's up Ri?

Q:     Hey what's up man?  What's up with that?

Rese: Man, you know man.  Sal got into it with BJ last night.  They stole his money and they kicked him out and all that but I'm still on my job you hear me?

Q:     What that ain't even done yet huh?

Rese: Naw.  I gotta I gotta I been on that.  Oh I don't even know you feel me how the dog lookin now.  I just found out how the dog looks.

Q:     Man that's fucked up.

Rese: Alright.  Man this nigger man.

Q:     Man.  Hey just fuck it man.  Don't even um just fuck it man.

Rese: Just fuck it Ri?

Q:     Yeah.  Fuck it.  Let me speak to Valerie.

Government Trial Exhibit 32A at 10.

-10-

The following are excerpts from the government's transcript of a telephone conversation between Mahasin and Ron Riggins on April 3, 2002:

Q:   I'm just waitin man, I'm just waitin.  And that nigger Rese just fuckin up.

R [Ron]: He fuckin up?

Q:   Man fuckin up, wouldn't handlin no business and get that back from him too.

R:   You lyin?

Q:   Yeah.  (inaudible)

R:   Oh ok.

Q:   All this time just been holdin onto that and gettin ridin around gettin high and drunk.

R:   He said that he was you know what I'm sayin, out there.

Q:   Naw, he ain't.

R:   Lyin.

Q:   And I got ten day and then you know

R:   Yeah.

Q:   After ten days that you know once they identify that's it.

     . . . .

R:   He said he was taking care of business.

Q:     Nope.  I said I'm finna to have to go to trial man he can't handle no business man.

R:     I mean Rese talking to me like he everything all good and (inaudible).

Q:     Naw.

       . . . .

R:     How much money do you need?

Q:     Um just you know.  Shit.  I don't know.  At least one one big thing here you know?

R:     Right.

Q:     Yeah. that's it.

R:     That's all you need to to get out?

Q:     Yep.

R:     You only need to get out?

Q:     Yep.  That's all I need.  If that if that would like if he would've um gone and um you know handled that right?

R:     Yeah.

Q:     I would've been out the next yes- the next day.  I would've been out today.  Yep.  And now um now I've got um ten days and if I don't give him that money then um then that you know then that's going be fucked up, its all bad.

       . . . .

-12-

Q: And then they point you out and say, "Yeah he the one who did this" whatever.

R: Uh-huh yeah yeah.

Q: And they only got one witness on my case.

. . . .

Q: And and on the on the eleventh all the you know the witnesses going to come forward, just one witness, so that witness going to come forward, he going to point and say this person did this and this you know? And they

R: Do uh

Q: And that'll be

R: Do do do uh that puppy still live in that same house?

Q: Yep.

R: You know I never got a chance to see that puppy.

Q: Yep but Sal you know um you know Sal they all know uh you know.

R: Sal say he was over there with him.

Q: Yeah.

. . . .

Q: Look, he showed them the dog, look he showed them the dog, he still didn't steal the dog. He showed em the dog and everything he still didn't steal the dog.

-13-

R:     Damn.

Q:     Yep.

R:     I mean what what it was in a bad spot or somethin?

Q:     Naw, it's in a perfect, everything perfect, it just he ain't perfect. Hey fuck man had I be out if got two of me, it woulda been good.

R:     Right.

Q:     We'd a had the dog, you know how quick I'd get him, I'd get dog.

       . . . .

R:     He still be at your mom's?

Q:     Yeah.

R:     I'm uh going over there and holler at him today.

Q:     Yeah.

R:     I'm going to make sure I catch up with him.

Q:     But unless some motherfucker walk him through it, he just all fucked up.

R:     Right, right, right, right.  I'm gonna go there if I catch him, you know what I'm saying, I'm I'm walk him through it just how you say.

Q:     Yep cuz if it don't, if it don't, you know you know cuz once I go to the eleventh that's that pretrial.

R:     Right.

Government Trial Exhibit 33A at 6-16.

The following are excerpts from the government's transcript of a conversation between Mahasin and "Gas," which followed directly after the above-quoted conversation between Mahasin and Riggins:

Q:     Man I yep I got the statement that one dude made it's um sayin that you know the stuff was mine and stuff?

G [Gas]:  Oh yeah?

Q:     Yep.  And they say on the on the eleventh he goin point me out or whatever and say that that's me.
. . . .

G:     I thought the little shit supposed to drop and the big shit supposed to pop?

Q:     That's how it's supposed to go.  But nigger's out there

G:     It's all bad.

Q:     Nigger's out there getting high and shit and ain't handlin nothin just some fucking fag so you know.

. . . .

G:     You know Rese got the dog?

Q:     Huh?  I know but he ain't doin nothin he ain' doing it.

-15-

G: He ain't putting it down?

Q: Nope.

G: He supposed to put it down right?

Q: Yeah he ridin around gettin high and stuff.

. . . .

G: So check it out check it out, I'm gonna say it like this. The red one or the white Camaro?

Q: Huh?

G: The red IROC or the white IROC?

Q: Oh you know you know who um testifying against me huh?

G: The red IROC?

Q: The Ben

G: Or the white? The red one?

Q: Naw the white.[4]

G: Oh yeah?

_____

[4]The car that Ben White was driving on April 6, 2000, before he got into Mahasin's minivan, was a white Camaro. Trial Transcript, Vol. II, at 9. On the date of the shooting, April 18, 2002, the white Camaro was parked in front of Ben White's house. Id., Vol. II, at 33. White testified at trial that one of his brothers previously owned a red Camaro IROC, but had sold it prior to the day of the shooting. Id., Vol. II, at 49.

Q:  Yeah.  Yeah they got that one his name you know Ben, the one Ben?

G:  Uh huh.

Q:  Yeah the he the one that's finna point me out.  He got caught with twenty-six ounces.

     . . . .

Q:  It's all bull I say it's all bad man they talking about going to trial, they talking about my case carry forty years.

G:  Damn.

Q:  Yeah.

Government Trial Exhibit 33A at 18-22.

When Mahasin and Gas were finished talking, Ron Riggins came back on the line and the following exchange took place between him and Mahasin:

R [Ron]:  Hey that's it man.

Q:  Huh?

R:  That's for you.

Q:  Alright.

R:  You hear me?

Q:  I hear you man.

R:  Alright.

-17-

Q:     That will be right on I'm telling you.

R:     Alright you owe me one.

Q:     Man I owe you more than one.  I owe you I owe you five.

R:     Alright.

Q:     I love you guys.

Government Trial Exhibit 33A at 24.

In addition, the district court admitted into evidence a recording of a telephone call placed by Mahasin on April 25, 2002, one week after White was shot.  The following excerpts from the government's accompanying transcript reflect a conversation between Mahasin and someone identified as "Miss Betty":

MB [Miss Betty]: Wait a minute listen to this.  You know what's his name?  That was stayin with (inaudible)?

Q:     Who?

MB:  Charisse boyfriend?

Q:     Yeah.

MB:  They got him the other day.

Q:     Oh they did?  What they say?

MB:  I can't tell you cuz they they might got (inaudible)

Q:     Huh?

MB:  Oh no.  I don't want to talk on the phone.

-18-

Q:     Yeah.  Well, you can tell me what he's charged with.

MB:   Huh?

Q:     You can tell me what he's charged with.

MB:   Uh wait a minute, wait a minute.  First Degree Armed Criminal Action and First Degree Assault.

Q:     And First Degree Assault?

MB:   Um hmm.

Q:     For what for what?  What they sayin they got um chargin him with that for?

MB:   Yeah I don't know.  I don't know.  I don't know.

       . . . .

MB:   They really they really ain't told me nothin.  But you know who I'm talkin about right?

Q:     Yeah.

MB:   Uh huh.

Q:     Oh who uh you talkin about Rese right?

MB:   Yeah I'm talkin about Rese.

Q:     Yeah.

MB:   But they got him for uh for the other dude don't but don't say his name though.

       . . . .

Q:     And the lady try to ask she talkin about, "Who was that guy in there that's at your court thing?"  The lady?

MB:    That what the lady told you?

Q:     Yeah and I told her, "You talkin about the falling star huh?"  And she talkin about, "No.  Who uh I'm talkin about the guy with the white shirt."  I say, "Yeah.  The fallin star."  I say, "You can see it all over the world."

MB:    What you talkin about Rese?

Q:     Huh?  Yeah.  And I kept givin her drag.  I'm talkin about the fallin star.

MB:    No you didn't.

Q:     Yeah.  She was gettin mad as hell.  She tal–, "Who was the guy with the white shirt that took off the band head thing?  That I made take off the headband?"  I said, "Oh you talkin about the fallin star you could see it all the way from China."[5]

. . . .

Q:     Oh they told me um this one guard up in here he real cool and stuff he told me said somebody died on my case.

MB:    Who he was talking about?

Q:     Huh?

_____

[5]At Mahasin's trial, Deputy United States Marshal Pat Schulze testified regarding Mahasin's status conference on April 23, 2002, and the events leading up to her arrest of Rose.  Schulze testified: "I inquired with Mr. Mahasin who that individual [Rose] was. . . . He just started rambling incoherent statements saying that he was like a celestial being and the stars and the moon.  Just rambling."  Trial Transcript, Vol. 3, at 89.

MB: Who he was talking about?

Q: Um that's what I don't know.  There's only one person on my case though other than me an that's Ben so I'm trying to find out if that's true or not.

MB: What?

Q: Cuz the DA trying to act like they don't know an– and if um if it's true then like the DA know they going have to let me go if it's true but we have to show some proof that it's true if it is true.

Government Trial Exhibit 37A at 9-13, 15.

During the trial, defense counsel talked with Ron Riggins about testifying on Mahasin's behalf.  Defense counsel personally served Riggins with a subpoena and, at that time, Riggins indicated that he was ready and willing to testify.  However, when the time came for Riggins to testify, he indicated that he wanted to exercise his Fifth Amendment right to remain silent.  After learning of Riggins's desire to invoke the Fifth Amendment, and upon the government's suggestion, the district court appointed an attorney for Riggins.  Thereafter Riggins consulted with his appointed attorney, took the stand without the jury present, and confirmed his decision to seek Fifth Amendment protection.  Riggins testified that he believed he might incriminate himself if required to answer questions about his telephone conversation with Mahasin on April 3, 2002.  Trial Transcript, Vol. III, at 43.  Defense counsel asked Riggins: "Has any lawyer for the government or U.S. attorney or agent told you that you may face jail time if you testify?"  Riggins answered: "They haven't threatened me with it, they told me that I may. . . . [t]hat I could be looking at ten, ten years."  Id. at 43-44.  Defense counsel then requested that the district court either grant counsel permission to examine Riggins to ascertain whether his testimony would be self-incriminating or, alternatively, that the district court itself examine Riggins for the same purpose.  Defense counsel argued that the district court has a duty, when so

-21-

requested, to make an inquiry to determine whether the witness has a real and substantive belief in the risk of self-incrimination. The district court declined to permit or to engage in such an examination of the witness. The district court did allow the defense to proffer a police report summarizing a statement Riggins had made on November 21, 2002, as evidence of what Riggins's testimony would have been if required to testify.[6] Id. at 45-48. Upon noting that Riggins had consulted with an appointed lawyer and that no one could be certain of what questions Riggins would be asked on cross-examination, the district court ruled that Riggins could not be compelled to testify.

The case was submitted to the jury at approximately 11:30 a.m. on December 12, 2002. The jury deliberated for approximately five hours that day before recessing early due to a juror feeling ill. The next day, December 13, 2002, the jury resumed their deliberations at approximately 9:00 a.m. The juror who had felt ill the day before arrived early, with no indication of further illness. Trial Transcript, Vol. 4, at 76-77. At about 2:00 p.m., the jury sent a note to the district court indicating that they were deadlocked on two counts. The district court responded with a note which stated: "I will discuss your note about being hung on two counts and will report back. In the interim, please continue your deliberations." Id. at 80. While the district court was discussing the matter with the attorneys, the jury sent another note stating that they were "hopelessly deadlocked" on two counts.

---

[6]In that police report, Detective Brady stated that Riggins had waived his Miranda rights and agreed to give a statement. Riggins denied having any knowledge of the assault on Ben White before the assault occurred. Regarding the recorded telephone conversation between Riggins and Mahasin on April 3, 2002, Riggins explained: a reference to a "pin being fucked up" concerned a mechanism in a car, not a gun; a reference to "Rese" being "fucked up" and not "taking care of business" concerned Rose's failure to give some money to Valerie Booker for Mahasin's attorney's fees; and his statement that he would "walk him through it" concerned a plan for Salidin Mahasin to steal a valuable pit bull dog in order to obtain money for Mahasin's attorney's fees. See Addendum to Brief for Appellant at 10.

No instruction was given at that time. The district court ordered that Mahasin be immediately brought into the courtroom so that any further discussion of the matter would take place in his presence. While Mahasin was being brought into the courtroom, the jury sent the district court a third note stating that they had reached a verdict on all four counts. The jury was then brought back into the court room at 3:20 p.m. Without objection, the district court proceeded to have the jury's verdict read. The jury found Mahasin guilty on all four counts charged in the indictment. No objection was made by the defense during any of these proceedings involving the jury's deliberations.

Mahasin was sentenced to 612 months imprisonment and five years of supervised release. He was ordered to pay $400.00 in special assessments and $2,345.15 in restitution. He timely filed the present appeal.

## Discussion

Admission of telephone conversations

Mahasin argues that the district court improperly admitted the recordings of the telephone conversations he had on April 1, 2, 3, and 25, 2002, while incarcerated at the St. Genevieve County jail. Mahasin does not challenge the admission of his telephone conversation with Rose on April 2, 2002. He does, however, challenge the admission of statements made by the other speakers whose voices were not identified by a witness and whose roles in the events in question were not proven by the government. Mahasin maintains that, as a result of the admission of the telephone conversations, statements were admitted into evidence in violation of the Federal Rules of Evidence and the Sixth Amendment confrontation clause.

Fed. R. Evid. 801(d)(2)(E) provides in relevant part: "A statement is not hearsay if . . . [t]he statement is offered against a party and is . . . a statement by a

coconspirator of a party during the course and in furtherance of the conspiracy." Mahasin argues that the government failed to show that a conspiracy existed which involved the unidentified speakers and further failed to show that their statements were made in furtherance of such a conspiracy. Regarding the telephone conversation of April 25, 2002, he additionally argues that any conspiracy that may have previously existed would have been over by then because the objective of the conspiracy was presumably the shooting of White, which occurred on April 18, 2002. See Duttons v. Evans, 400 U.S. 74 (1970) (statement made after the termination of a conspiracy, even if made to conceal the criminal enterprise, may not be admitted against a coconspirator under Rule 801(d)(2)(E)). Mahasin further argues that these violations of the hearsay rule and his Sixth Amendment confrontation right were not harmless beyond a reasonable doubt.

Under Fed. R. Evid. 801(d)(2), certain statements are considered to be admissions by a party-opponent and thus do not constitute hearsay. As stated above, for example, a statement is not hearsay if it was made by a party's coconspirator during the course and in furtherance of the conspiracy. Fed. R. Evid. 801(d)(2)(E). We review the district court's admission of coconspirator statements under Fed. R. Evid. 801(d)(2)(E) for an abuse of discretion. See United States v. Frazier, 280 F.3d 835, 848 (8th Cir. 2002). We will reverse the district court's evidentiary ruling only if it was a clear and prejudicial abuse of discretion. See United States v. Gonzales, 90 F.3d 1363, 1370 (8th Cir. 1996).

It was the government's burden to establish the admissibility of statements by Mahasin's alleged coconspirators under Fed. R. Evid. 801(d)(2)(E). The government was required to prove by a preponderance of the evidence that (1) a conspiracy existed, (2) both the declarant and Mahasin were members of the conspiracy, and (3) the declarant made the statement in the course and in furtherance of the conspiracy. See id. It was not necessary for the declarant to have been formally charged as a coconspirator or even be identified, so long as the statement in question

was itself sufficiently reliable in demonstrating the applicability of Rule 801(d)(2)(E). See United States v. Arias, 252 F.3d 973, 977 (8th Cir. 2001); United States v. Gonzales, 90 F.3d 1363, 1370 n.6 (8th Cir. 1996) (identifiability of the declarant is helpful, but not required, especially where the statement itself and the surrounding circumstances provide sufficient evidence of reliability).

In the present case, the district court held, with respect to the telephone conversations of April 1, 2, and 3, 2002, that the government had sufficiently shown that (1) a conspiracy existed to kill White to prevent his testimony against Mahasin, (2) Mahasin, Rose, and the unidentified speakers in the recorded telephone conversations were participants in that conspiracy, and (3) the statements by the unidentified speakers were made in the course and in furtherance of the conspiracy. Trial Transcript, Vol. III, at 2-5; id., Vol. IV, at 73. Based upon these findings, the district court held that the statements made by unidentified speakers in the telephone conversations of April 1, 2, and 3, 2002, were admissible under Fed. R. Evid. 801(d)(2)(E). Regarding the telephone conversation of April 25, 2002, the district court agreed with Mahasin, after the recording had already been played for the jury, that the conspiracy was already over when that conversation took place. Trial Transcript, Vol. III, at 38-39. However, the district court held that the admission of that telephone conversation was harmless error. Id. at 50.

Upon review, we first note that Mahasin has not specified for this court or the district court, which particular statement or statements by unidentified speakers in the April 1, 2, or 3, 2002, telephone conversations he views as improperly admitted under Fed. R. Evid. 802(d)(2)(E). Those telephone conversations were offered primarily to allow the jury to hear inculpatory statements made by Mahasin and Rose. The statements made by the unidentified speakers on those recordings were not offered to prove the truth of any matter asserted therein. To the extent that some statements by the unidentified speakers on those recordings could be viewed as offered for their truth, those statements themselves may reasonably be interpreted to establish by a

-25-

preponderance of the evidence that the unidentified speakers were participants in the conspiracy to kill White and that their statements were made in furtherance of the conspiracy.[7] Thus, the district court did not abuse its discretion in admitting, under Fed. R. Evid. 801(d)(2)(E), the telephone conversations of April 1, 2 and 3, 2002.

Regarding statements made by unidentified speakers in the telephone conversation on April 25, 2002, we again note that Mahasin has failed to specify exactly which statements he views as improperly admitted. From that conversation, we can discern no statement by a speaker other than Mahasin which remotely can be offered for the truth of any matter asserted therein. The government played the April 25, 2002, telephone conversation for the jury to show that Mahasin was, at that time, trying to ascertain whether or not the objective of the conspiracy – the death of White – had been achieved. The jury, of course, already knew that this objective had not been achieved. Because the statements made by unidentified speakers in response to Mahasin's inquiries were not offered as evidence to prove the truth of any matter asserted therein, the district court did not abuse its discretion in admitting April 25, 2002, telephone conversation into evidence.

Witness's exercise of Fifth Amendment right

As explained above, Ron Riggins, after being subpoenaed by the defense, was permitted by the district court to exercise his Fifth Amendment right against self-incrimination. On appeal, Mahasin argues that Riggins's testimony should have been admitted because "[n]either Mr. Riggins nor his counsel established any basis of a

---

[7]For example, in a statement made by the individual referred to as "Little Ronnie," that individual (presumably Ron Riggins) tells Mahasin: "Right, right, right. I'm gonna go there if I catch him, you know what I'm saying, I'm I'm walk him through it just how you say." Government Trial Exhibit 33A at 16. The government offered that and related statements to show the jury that Ron Riggins told Mahasin that he would review with Rose the plan for shooting White.

possibility, even remotely, that he may be prosecuted based on the substance of his testimony." Brief for Appellant at 22.

The law is well-established that the Fifth Amendment privilege against self-incrimination protects against real dangers, not remote and speculative possibilities. Mason v. United States, 244 U.S. 362, 364 (1917). The determination of whether a potential witness may exercise his or her Fifth Amendment right to remain silent, notwithstanding a criminal defendant's countervailing Sixth Amendment right to compulsory process, is a matter for the trial court's discretion. See United States v. Robaina, 39 F.3d 858, 862 (8th Cir. 1994) ("The Compulsory Process Clause of the Sixth Amendment guarantees a criminal defendant the right 'to have compulsory process for obtaining witnesses in his favor.' U.S. Const. amend. VI. Under Fed. R. Evid. 401, the district court has discretion in determining the relevancy and admissibility of evidence.") "The district court is ordinarily in the best position to 'appreciate the essential facts' and must 'be permitted to exercise some discretion, fructified by common sense, when dealing with this necessarily difficult subject.'" United States v. Washington, 318 F.3d 845, 856 (8th Cir. 2003).

Mahasin first contends that the district court abused its discretion by failing to conduct a sufficient inquiry into the sincerity and validity of Riggins's apprehension of self-incrimination. We disagree. The district court was specifically informed by the government that Riggins "has the potential of being charged in this case and he was made aware of that when he was initially interviewed back in November [2002]." Trial Transcript, Vol. III, at 13. The district court took the precaution of appointing an attorney for Riggins, so that Riggins could make an informed decision as to whether he wished to assert his Fifth Amendment right. While the district court did not allow defense counsel to examine Riggins as to the meaning of his statements to Mahasin in the April 3, 2002, the district court was familiar with Riggins's statement to the police which, according to the defense, represented the sum and substance of Riggins's anticipated testimony. As noted above, in that statement Riggins told the

police, among other things, that his promise to Mahasin that he would "walk him through it" referred to a plan to have Salidin Mahasin steal a valuable dog to obtain money for Mahasin's legal expenses – which itself would be an self-incriminating admission. More importantly, however, the district court was well-aware from listening to the government's evidence at trial that Riggins's statements to Mahasin on the April 3, 2002, could reasonably be interpreted as assurances that he, Riggins, would help Mahasin convince Rose to shoot White. Thus, in view of the totality of the circumstances, the district court did not abuse its discretion in concluding – without further inquiry – that the prospect of allowing the government to cross-examine Riggins would expose Riggins to a real and substantial risk of criminal prosecution. See United States v. Bowling, 239 F.3d 973, 977 (8th Cir. 2001) ("'To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result.'") (quoting Hoffman v. United States, 341 U.S. 479, 486-87 (1951)).

We next consider Mahasin's contention that Riggins refused to testify because a government agent improperly threatened him with prosecution. Mahasin argues that "[g]overnment actions, in this case, are directly analogous to the facts in United States v. Hammond, 598 F.2d 1008 (5th Cir. 1979)." Brief for Appellant at 25.

In Hammond, a witness for the defense had already testified and had been cross-examined when the trial court called a recess. During the recess, an FBI agent approached the witness and said that he knew about the "situation in Colorado," referring to a matter in which the witness had been indicted in Colorado and had agreed to cooperate with the FBI there. The FBI agent told the witness that, if he "continued on," he would have "nothing but trouble" in Colorado. The next morning, the witness refused to testify further. The witness indicated that he feared that, if he continued to testify, the government would retaliate against him in the Colorado

-28-

matter. The facts established by the record in the present case are clearly distinguishable. In the present case, on the morning of the day Riggins was scheduled to testify under a defense subpoena, the government informed the district court, in the absence of the jury, that Riggins had "called the DEA agent last night or this morning – both – and indicated he wanted to take the Fifth." See Trial Transcript, Vol. III, at 12-14. Thereafter, defense counsel was given an unfettered opportunity to question Riggins regarding his decision to invoke the Fifth Amendment and its surrounding circumstances. Defense counsel elicited the following testimony by Riggins:

> Mr. McGraugh [defense counsel]: Have you in any way been told or threatened that you may face jail time if you testify in this case?
>
> Mr. Riggins: Correct.
>
> Mr. McGraugh: Who threatened you?
>
> Mr. Riggins: I haven't been threatened, but my lawyer told me that without him present, him, without him present that I shouldn't testify against – I mean I shouldn't take the – to say anything.
>
> Mr. McGraugh: Has any lawyer for the government or United States attorney or agent told you that you may face jail time if you testify?
>
> Mr. Riggins: They haven't threatened me with it, they told me that I may.
>
> Mr. McGraugh: All right, what did they tell you?
>
> Mr. Riggins:  That I could be looking at ten, ten years.
>
> Mr. McGraugh: If you testify?
>
> Mr. Riggins: Right.

Mr. McGraugh: Is that the reason why you think it is wise to take the Fifth Amendment?

Mr. Riggins: Correct.

Trial Transcript, Vol. III, at 43-44.

Apart from this testimony, and the statement by the government to the district court that Riggins had himself contacted the DEA agent, there is nothing in the record indicating that any government lawyer or agent spoke with Riggins, much less threatened Riggins, regarding the consequences of testifying at Mahasin's case. In other words, the record merely establishes that Riggins contacted a DEA agent, presumably to ask about the potential consequences of his testifying for Mahasin, and the DEA agent told him that he "could be looking at ten years." Moreover, Riggins's decision to invoke the Fifth Amendment was not finalized until after he consulted with an attorney – further establishing that it was an independent, deliberate, and informed decision, not the result of any threats or coercion. While the government did suggest to the district court that Riggins receive appointed counsel, there was nothing improper about the government's actions. "A prosecutor is not prohibited, upon speaking with a witness and recognizing potentially damaging cross-examination, to inquire about whether a defense witness should be appointed an attorney." United States v. Washington, 318 F.3d at 855. In sum, we hold that the district court did not abuse its discretion in permitting Riggins to exercise his Fifth Amendment right to remain silent.

Jury deliberations

Mahasin argues that his right to a fair trial was violated as a result of the district court's handling of two notes sent to the district court by the jury during the second day of their deliberations, indicating that they were deadlocked on two counts. As explained above, the district court received the first note at approximately

-30-

2:00 p.m. and responded by informing the jury that it would consult with the parties and, in the meantime, they should continue deliberating.  When the second note was received a short time later, the district court ordered that Mahasin be brought to the court room, so he could be present for any further discussion; at that point, no response to the second note was given to the jury.  Shortly thereafter, before any further discussion with the parties had even begun, the district court received a third note from the jury stating that they had reached a verdict.  Without objection from either party, the district court had the jury returned to the court room and the verdict was received in open court.  The jury returned a verdict of guilty on all four counts.  Now, on appeal, Mahasin argues:

> The Court's actions prejudiced defendant as it signaled to jurors that the Court would require a dispositive verdict.  This is particularly troublesome given the fact that one juror was gravely ill and required special attention during the deliberations the day before.  The Court's action was coercive to the minority juror(s) in that his instruction willfully misinformed the duties and obligations of the majority and fail[ed] to reiterate the defendant's rights.

Brief for Appellant at 36.

We first note that the plain error standard of review applies because there was never any timely objection to the district court's handling of the jury's communications during their deliberations.  In the present case, the district court prudently decided to consult with the parties before formally responding to the jury's first two notes.  The district court and the parties had not completed that discussion when the jury reached its verdict. Indeed, the amount of time that lapsed between the district court's receipt of the jury's first note and the return of the jury's verdict was less than an hour and a half.  See Trial Transcript, Vol. 4, at 80-82 (establishing lapse of time to be approximately one hour and twenty minutes).  In the meantime, the district court had simply informed the jury (after receiving the first note): "I will

discuss your note about being hung on two counts and will report back. In the interim, please continue your deliberations." Trial Transcript, Vol. 4, at 80. Contrary to Mahasin's assertions on appeal, the district court did *not* signal to the jury that it "required a dispositive verdict," nor did it "misinform" the jury of anything, "willfully" or otherwise. Moreover, nothing in the record indicates that the juror who had been ill on the first day of deliberations was still feeling ill on the second day.[8] Upon review, we hold that the district court committed no error, much less plain error, in handling the jury's communications during their deliberations in the present case.

Sufficiency of the evidence

Finally, Mahasin argues that the evidence was insufficient as a matter of law to support the jury's verdict. In reviewing the sufficiency of the evidence to support a guilty verdict, we view the evidence in the light most favorable to the government, resolving all evidentiary conflicts in favor of the government and accepting all reasonable inferences that support the verdict. We will reverse only if the evidence, so viewed, cannot reasonably support a finding of guilt beyond a reasonable doubt. United States v. Collins, 340 F.3d 672, 678 (8th Cir. 2003). Under this standard of review, the testimony of Ben White and other government witnesses must be credited. That testimony, along with the tape recordings and other evidence presented by the government, as well as all reasonable inferences to be drawn therefrom in favor of the government, provide more than an adequate basis for the jury's verdict of guilt beyond a reasonable doubt on each of the four counts in the indictment. In other

---

[8]The record indicates that the district court was, in fact, attentive to the previously-ill juror's condition when she returned for the second day of deliberations. Trial Transcript, Vol. 4, at 76-77 (The district court stating on the record: "I indicated to counsel . . . that I would monitor the jurors' return today and I did so and they were all punctual. As a matter of fact, the ill juror was here at approximately 20 minutes after 8:00, so all of the jury was here at nine o'clock . . . .").

words, we hold that the evidence was sufficient as a matter of law to support the jury's verdict.

## Conclusion

The judgment of the district court is affirmed.

_____