# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 04-2310

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of South Dakota. |
| Michael P. Roy, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: December 14, 2004
Filed: May 20, 2005

_____

Before WOLLMAN, LAY, and COLLOTON, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

Michael P. Roy was convicted of one count of assault with a dangerous weapon in violation of 18 U.S.C. § 113(a)(3) (count 1), one count of assault resulting in serious bodily injury in violation of 18 U.S.C. § 113(a)(6) (count 2), and two counts of assaulting a federal officer in violation of 18 U.S.C. § 111 (counts 3 and 4). The district court sentenced him to three concurrent ninety-month terms of imprisonment. On appeal, Roy argues that the district court: (1) incorrectly ruled that the victim of his assault qualified as a federal officer; (2) erred in refusing to grant his motion to force the government to elect between or consolidate counts 3 and 4 of his indictment; (3) improperly admitted a videotape of his booking; (4) possessed

insufficient evidence on which to apply a five-level enhancement for infliction of bodily injury under United States Sentencing Guidelines Manual (U.S.S.G.) § 2A2.2(b)(3)(E) (2003); and (5) computed his sentence based on facts not found by the jury, in violation of his Sixth Amendment rights. We affirm in part and reverse in part.

## I.

In the early morning hours of May 19, 2003, Scott Van Roekel, a member of the Flandreau City Police Department and who, as set forth below, was also acting as a member of the Flandreau Santee Sioux Tribal Police Department, responded to a disturbance call on the Flandreau Santee Sioux Reservation in Flandreau, South Dakota. According to Van Roekel's dispatcher, an individual named Michael Roy was vandalizing the duplex of Glen Rederth, a fellow resident of Roy's housing development.

Upon arriving at the scene in his marked police cruiser, Van Roekel observed Roy walking back toward his duplex from Glen Rederth's duplex. After spotting Van Roekel, Roy ran into his duplex. Van Roekel then asked Roy about the vandalism, speaking to him through an open window in the duplex. Roy responded by repeatedly telling Van Roekel that he was going to kill him, occasionally adding that he possessed a shotgun. Van Roekel then contacted Flandreau City and Flandreau Santee Sioux Tribal Chief of Police Kenneth James and requested that he come to the scene. After James's arrival, both officers continued to try to persuade Roy to exit his duplex. Roy again threatened to kill both officers. He specifically stated that he was going to kill "you white people,"[1] and additionally made threats against James's daughter. Roy also told the officers that they could not enter his home without a search warrant.

---

[1]Van Roekel is Caucasian; both James and Roy are Native American.

-2-

Approximately five minutes later, Roy exited his duplex and began raising his arms up and down and yelling in a Native American dialect. James instructed Van Roekel to apprehend Roy, and Van Roekel began to run in Roy's direction. Roy spotted Van Roekel and, despite Van Roekel's repeated commands to stop, ran into his duplex and closed his door behind him. Van Roekel then kicked the door open and entered the darkened duplex. Roy and Van Roekel immediately began to struggle, and Van Roekel executed a leg sweep in order to bring Roy to the floor. During this confrontation, Van Roekel felt a sharp pain in his abdominal region. Van Roekel nevertheless continued to subdue Roy and, with James's assistance, eventually succeeded in handcuffing him. In the process of subduing Roy, both James and Van Roekel noticed that Roy had dropped a large pocketknife.

Roy continued his verbal abuse of the officers after being handcuffed, adding that the officers could not do this to him. Eventually, the officers placed Roy in Van Roekel's police cruiser. Van Roekel then examined his abdominal region and discovered a two- to three-inch cut in his stomach above the navel, from which some three inches of material protruded.

Roy was subsequently charged in a four-count indictment. Prior to trial, Roy argued before the magistrate judge that: (1) the government could not properly indict him for assaulting a federal officer because Van Roekel did not qualify as such; and (2) the government should have been required to elect between or consolidate the two counts of assaulting a federal officer because the two counts were multiplicitous. The magistrate judge denied both motions. Roy then successfully sought to extend his time to object to the magistrate judge's report and recommendation until ten days after the completion of his trial. See D. Ct. Order of October 31, 2003, at 1; Fed. R. Crim. P. 45(b)(1)(A). At trial, Roy was convicted on all four counts. The district court later denied Roy's objections to the magistrate judge's report and recommendation, which effectively reasserted the positions Roy had taken before the magistrate judge. See D. Ct. Order of February 10, 2004, at 1.

-3-

At sentencing, the district court applied a five-level enhancement to Roy's base offense level, finding that the injury inflicted upon Van Roekel fell between the sentencing guidelines' definitions of "serious bodily injury," which mandated a four-level enhancement, and "permanent or life-threatening bodily injury," which mandated a six-level increase. See U.S.S.G. § 2A2.2, cmt. n.1 (2003); U.S.S.G. § 2A2.2(b)(3)(E) (2003). The district court also imposed a four-level enhancement based upon Roy's use of a dangerous weapon and a three-level enhancement based upon its finding that Roy knew or had reasonable cause to believe that Van Roekel was a law enforcement officer at the time of the assault. See U.S.S.G. §§ 2A2.2(b)(2)(B) (use of a dangerous weapon), 3A1.2(b)(1) (assault of law enforcement officer) (2003). When added to Roy's base offense level of 15, these enhancements resulted in a total offense level of 27. The total offense level, in combination with Roy's criminal history category (Category II), resulted in a guidelines range of 78 to 97 months. The district court sentenced Roy to 90 months on each of counts 1 and 2 and 90 months to cover both counts 3 and 4, all terms to run concurrently.

## II.

### A.

Roy first argues that counts 3 and 4 of his indictment should have been dismissed because the government failed to prove that Van Roekel was a federal officer, for purposes of 18 U.S.C. § 111, at the time of the incident. Roy raised his objections in a pretrial motion before the magistrate judge, a motion at the close of evidence, and a post-trial objection to the magistrate judge's report and recommendation.

Section 111(a)(1) proscribes assaults on any person identified in 18 U.S.C. § 1114 "while engaged in or on account of the performance of official duties." Such persons include "any officer or employee of the United States or of any agency in any

branch of the United States Government."[2]  18 U.S.C. § 1114.  Whether an officer in Van Roekel's position, i.e., an officer of the Flandreau City and Flandreau Santee Sioux Tribal Police Department, qualifies as a federal officer is a "threshold legal question" for the court.  United States v. Bettelyoun, 16 F.3d 850, 853 (8th Cir. 1994).  Whether Van Roekel himself was such an officer, as well as whether he was engaged in official duties at the time of the incident, are questions of fact for the jury.  Id.

The Secretary of the Interior (Secretary), through the Bureau of Indian Affairs (Bureau), is charged with providing or assisting in the provision of law enforcement services on Indian lands.  25 U.S.C. § 2802(a).  In connection with this responsibility, the Secretary "may charge [Bureau] employees with a broad range of law enforcement powers."  United States v. Schrader, 10 F.3d 1345, 1350 (8th Cir. 1993); 25 U.S.C. § 2803.  In addition to utilizing Bureau employees, "[t]he Secretary may enter into an agreement for the use…of the personnel or facilities of a Federal, tribal, State, or other government agency" to assist in the provision of law enforcement services in Indian Country.  25 U.S.C. § 2804(a).  The Secretary may authorize an officer of the agency contemplated by such an agreement "to perform any activity the Secretary may authorize under section 2803."  Id.  "When acting under such authority, 'a person who is not otherwise a Federal employee shall be considered to be an employee of the Department of the Interior'" for purposes of 18 U.S.C. §§ 111 and 1114.  Schrader, 10 F.3d at 1350 (quoting 25 U.S.C. § 2804(f)).

For calendar year 2003, the Secretary and the Flandreau Santee Sioux Tribe entered into a contract for the provision of law enforcement services.  Such contracts are known as "638 contracts," referring to the public law number that authorized

---

[2]Section 1114 formerly identified a long list of federal officers and functions that fell within its scope.  This list was replaced with more general language in 1996.  See Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, § 727, 110 Stat. 1214, 1302.

them. Id. One of the Flandreau Santee contract's stated purposes was "[t]o provide a joint Law Enforcement Agreement between the City [of Flandreau] and Flandreau Santee Sioux Tribe." To that end, the contract stipulated that "[t]he Flandreau Police Department shall provide law enforcement services for all lands within the boundaries of the City of Flandreau and on all trust lands under the jurisdiction of the [Flandreau Santee Sioux] Tribe."

Our first task, like that of the district court, is to determine whether the 638 contract, taking into account the manner in which it delegates the Bureau's law enforcement authority, is sufficient to authorize officers of the Flandreau City Police Department to exercise the Bureau's law enforcement functions under 25 U.S.C. § 2804(a). Bettelyoun, 16 F.3d at 853. We hold that it is. Although the contract does not expressly delegate the Bureau's law enforcement functions to the Flandreau Santee Sioux Tribe, to be passed in turn to the Flandreau City Police Department, section 2804(a) imposes no such requirement. Rather, to constitute a proper delegation, the contract need only be "an agreement for the use…of the personnel or facilities of a Federal, tribal, State, or other government agency" to aid in law enforcement in Indian Country and authorize that agency to perform some law enforcement activity that the Secretary could authorize the Bureau to perform under section 2803. Here, the Secretary and the Flandreau Santee Sioux Tribe mutually agreed that the Flandreau City Police Department would provide "law enforcement services on all lands held by the Tribe."[3] Because section 2804(a) does not require that the party to which the Secretary delegates his authority be an Indian Tribe, or even a contracting party, this agreement was a valid delegation of the

---

[3]The Bureau's contracting officer (who acts on behalf of the Secretary) testified that this phrase was meant to "sign over to the Flandreau City Police Department to provide law enforcement services on the Flandreau Reservation." We take this to mean that the contract's contemplated aim was to authorize the City to perform all applicable law enforcement functions on the Flandreau Santee Sioux Reservation.

Secretary's—and the Bureau's—entire law enforcement responsibility under section 2803.

Roy nevertheless contends that, even if the delegation of law enforcement responsibilities was valid, Van Roekel could not qualify as a federal officer because he had not completed the training required of officers who exercise the Bureau's law enforcement authority. Although Roy did not identify the legal source of his contention, it ostensibly arises from a Bureau regulation stating that "[l]aw enforcement personnel of any program funded by the Bureau of Indian Affairs must not perform law enforcement duties until they have successfully completed a basic law enforcement training course prescribed by the Director." 25 C.F.R. § 12.35 (2003). At trial, Van Roekel conceded that he had not yet attended "the BIA class" at the time of the incident. In the absence of a Bureau or Department of the Interior interpretation to the contrary, however, we do not believe that a failure to complete the training course prohibits an officer in Van Roekel's position from qualifying for federal officer status. The regulation does not so state, and such a holding would be inconsistent with the purpose behind 18 U.S.C. § 111: "to protect *both* federal officers and federal functions." See Schrader, 10 F.3d at 1351 (quoting United States v. Feola, 420 U.S. 671, 679 (1975)) (emphasis in original). Van Roekel was undoubtedly performing a federal function—the provision of law enforcement services on Indian land—at the time of the incident, and thus he was entitled to federal officer status as a threshold matter.

Van Roekel may qualify for federal status and its concomitant protections, however, only if he was "engaged in the performance of his official duties" during the incident. Id. at 1350-51. The jury properly determined that he was, and Roy does not dispute the jury's finding in this regard. Accordingly, Van Roekel qualified as a federal officer at the time of the incident, and Roy's motions to dismiss counts 3 and 4 were properly denied.

## B.

Roy next contends that counts 3 and 4 of his indictment were multiplicitous. An indictment is multiplicitous if it charges a single offense in multiple counts. United States v. Christner, 66 F.3d 922, 927 (8th Cir. 1995). Multiple punishments for the same criminal offense are barred by the Double Jeopardy Clause of the Fifth Amendment. United States v. Bennett, 44 F.3d 1364, 1368 (8th Cir. 1995). In order to show a violation of that clause, "a defendant must show that the two offenses charged are in law and fact the same offense." Id. A claim that an indictment is multiplicitous in violation of double jeopardy is reviewed *de novo*. United States v. Beltz, 385 F.3d 1158, 1161 (8th Cir. 2004).

Count 3 of Roy's indictment charged him with assaulting Van Roekel (a federal officer, see supra) and causing serious bodily injury in violation of 18 U.S.C. §§ 111(a)(1) and (b). Count 4 of the indictment charged Roy with assaulting Van Roekel with a deadly and dangerous weapon in violation of the same statutory provisions. Section 111(a)(1) criminalizes assaults on certain federal officers in cases of simple assault and in "all other cases." United States v. Yates, 304 F.3d 818, 821 & n.4 (8th Cir. 2002), cert. denied, 538 U.S. 909 (2003). Section 111(b) provides for an enhanced penalty for assaults that utilize deadly or dangerous weapons or that inflict serious bodily injury. Id. at 821. Against the background of these provisions, we have held that "[t]he conduct proscribed by § 111(b)…is a subcategory of the 'all other cases' conduct" proscribed in § 111(a). Id. at 823. Thus, counts 3 and 4 of Roy's indictment allege two alternative manners of committing the same offense—assault of a federal officer in "all other cases" not involving simple assault. Because both counts also arise out of a single factual occurrence (Roy's stabbing of Van Roekel), they are the same offense in law and fact and thus are multiplicitous with each other.

Although the prosecutor did not elect between or consolidate the multiplicitous counts, multiplicitous indictments may be saved at the trial stage if the district court

submits an appropriate instruction to the jury. United States v. Sue, 586 F.2d 70, 71 (8th Cir. 1978) (per curiam). An example of such an instruction is found in our decision in United States v. Moore, 149 F.3d 773 (8th Cir. 1998), where "the district court submitted the two counts together on a single verdict form and instructed the jurors that if they found a defendant guilty of murder in furtherance of a [continuing criminal enterprise], they need not consider the charge of murder while engaged in a marijuana distribution conspiracy." Id. at 779 (involving multiplicitous charges of murder in furtherance of a continuing criminal enterprise in violation of 21 U.S.C. § 848(e)(1)(A) and murder in furtherance of a marijuana distribution conspiracy in violation of the same statute). This instruction eliminated the risk that any defendant would be subject to multiple convictions for the same offense because the defendants could only be convicted of the second of the multiplicitous charges if they were acquitted of the first. Id.

In contrast, the district court instructed the jury in Roy's trial as follows:

> A separate crime is charged in each count of the indictment. You should consider separately each charge made against the defendant and the evidence pertaining to it. The fact that you may find the defendant guilty or not guilty as to one of the offenses charged against him should not control your verdict as to any other offense charged against him.
> All four counts of the indictment refer to the same single incident. This single incident is the stabbing of Scott Van Roekel which occurred on or about May 19, 2003, in Flandreau, South Dakota.

This instruction left open the possibility that the jury could find Roy guilty on both counts 3 and 4, and thus that he would be twice convicted for the same offense. Accordingly, the instruction did not remedy the multiplicitous indictment.

Because the multiplicitous indictment was not remedied at trial, we must determine whether the indictment prejudiced Roy. Sue, 586 F.2d at 71. The

"principal danger that the multiplicity doctrine addresses" is the risk that a defendant might receive multiple punishments for a single offense. United States v. Webber, 255 F.3d 523, 527 (8th Cir. 2001). Because the district court sentenced Roy to one term of 90 months imprisonment and one $100 special assessment to cover both counts 3 and 4, it is clear that Roy did not receive multiple sentences for the same offense. Notwithstanding the lack of a second sentence, however, Roy's second conviction amounts to an impermissible cumulative punishment in violation of double jeopardy. Ball v. United States, 470 U.S. 856, 864-65 (1985); United States v. Jones, 403 F.3d 604, 607 (8th Cir. 2005); United States v. Duke, 940 F.2d 1113, 1120 (8th Cir. 1991); United States v. Mendoza, 902 F.2d 693, 697-98 (8th Cir. 1990). Accordingly, one of Roy's convictions on counts 3 and 4 must be vacated.[4] Duke, 940 F.2d at 1121.

## C.

Roy also claims that the district court erroneously allowed a videotape of his booking to be shown to the jury in violation of Fed. R. Evid. 403. We review the district court's interpretation and application of the rules of evidence *de novo*, and review the district court's factual findings supporting an evidentiary ruling for abuse of discretion. United States v. Smith, 383 F.3d 700, 706 (8th Cir. 2004). Because Rule 403 issues implicate a factual balancing of how a particular piece of evidence might affect the jury, however, we properly give deference to the trial judge. United States v. Blue Bird, 372 F.3d 989, 991 (8th Cir. 2004).

---

[4]Like the magistrate judge, we direct the government in future cases to our prior holding that, where a "statute specifies two or more ways in which one offense may be committed, all may be alleged in the conjunctive in one count of the indictment, and proof of any one of the methods will sustain a conviction." Gerberding v. United States, 471 F.2d 55, 59 (8th Cir. 1973). This method of procedure would adequately inform the defendant of each allegation that he must defend against while solving any potential multiplicity problems.

The videotape, which was made pursuant to an official policy mandating the recording of all potentially disruptive detainees, without doubt portrayed Roy in a negative light. Its main purpose, however, was to refute Roy's anticipated testimony. The videotape shows that throughout the thirty-minute booking process, Roy cursed frequently at the booking officers, threatened to harm or kill them and their families, and uttered several racial and sexual epithets. Notably, however, he also proclaimed to the booking officers that "you cops broke down my door," that "y'all broke down my door and I have a right to protect myself," and that "that motherf—er" (presumably Van Roekel) was lucky that he (Roy) did not shoot and kill him. The videotape thus refuted Roy's assertions at trial that he was apologetic for stabbing Van Roekel and that he had done so only because he thought that Van Roekel was a neighbor with whom Roy had been feuding. Because of the dispute between Roy's testimony and that of the officers on the scene, the videotape was highly probative of Roy's state of mind at the time of the incident. Granted that the videotape did nothing to enhance Roy's image in the eyes of the jury, marked as it was throughout by his cursing, racial rantings, and threats of violent retaliation, we agree with the district court that any negative effects from its display were not substantial enough to outweigh its probative value. Accordingly, the videotape was properly admitted under Rule 403.

Roy's opening brief before this court also includes an assertion that Fed. R. Evid. 404 provides an independent bar against the admission of the videotape because the videotape constituted evidence of unrelated "bad acts" offered to prove that Roy has a bad character and was acting in conformity therewith at the time of the incident. Because Roy's objections to the videotape at trial were premised solely upon Rule 403, we review his Rule 404 claim for plain error. See Revels v. Vincenz, 382 F.3d 870, 877 (8th Cir. 2004). In the context of Rule 404, "we presume that evidence of 'other crimes, acts, or wrongs' is admissible [under Rule 404(b)] to prove motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, unless the party seeking its exclusion can demonstrate that it serves only to

prove the defendant's criminal disposition." Smith, 383 F.3d at 706. The primary stated purpose for the videotape's introduction at Roy's trial was to prove that he was not mistaken as to Van Roekel's identity, and Roy presented no evidence to negate that purpose. Thus, there was no plain error, if any error at all, in admitting the videotape.

## III.

### A.

Roy challenges the sentence imposed by the district court. He contends for the first time on appeal that the Supreme Court's decision in Blakely v. Washington, 124 S. Ct. 2531 (2004), rendered his sentence invalid because it was based upon facts not admitted by him or found by a jury beyond a reasonable doubt, in violation of his Sixth Amendment rights.

Although Blakely explicitly did not address the federal sentencing guidelines, id. at 2538 & n.9, the Court subsequently extended its reasoning to the guidelines in United States v. Booker, 125 S. Ct. 738 (2005). There, the Court held that "[a]ny fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." Id. at 756. The Court applied this holding to all cases (including Roy's) that were on direct review at the time Booker was decided. Id. at 769.

Because Roy did not raise his Blakely/Booker challenge in the district court, we review for plain error. See United States v. Olano, 507 U.S. 725, 731-32 (1993). To obtain relief, Roy must show that the district court committed error, that the error was plain, and that the error affected his substantial rights. Id. at 732. Even if he meets those criteria, however, our power to grant relief is discretionary and should

only be exercised if the error seriously affected the "fairness, integrity or public reputation" of his trial.  Id.

For Booker purposes, error occurs when a district court uses facts not found by the jury or admitted by the defendant in order to enhance a defendant's sentence within the context of a mandatory sentencing guidelines system.  United States v. Pirani, No. 03-2871, slip op. at 9 (8th Cir. April 29, 2005) (en banc).  In Roy's case, the district court assessed a five-level enhancement based upon its finding that the injury that Roy inflicted on Van Roekel fell between the guidelines definitions of "serious bodily injury" and "permanent or life-threatening" bodily injury.[5]  See U.S.S.G. § 2A2.2(b)(3)(E) & cmt. n.1.  The jury explicitly found that Roy's assault on Van Roekel resulted in "serious bodily injury."  This finding, however, was entered pursuant to the statutory definition of serious bodily injury.  See 18 U.S.C. § 113(b)(2) (giving "serious bodily injury" for assault purposes the same definition used in 18 U.S.C. § 1365); 18 U.S.C. § 1365(h)(3) (defining serious bodily injury).  The statutory definition states that serious bodily injury is bodily injury which involves a substantial risk of death, extreme physical pain, protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member, organ, or mental faculty.  18 U.S.C. § 1365(h)(3).  Because the definition is stated in the disjunctive, the jury's finding that serious bodily injury resulted from Roy's assault could have been supported by a finding that only one of the elements in the definition was satisfied.

Furthermore, the statutory definition of serious bodily injury is not identical to that set forth in the guidelines.  On the contrary, the disjunctive elements that make up the statutory definition are distributed between the guidelines definitions of serious bodily injury and permanent or life-threatening bodily injury.  Specifically,

---

[5]Roy concedes that a four-level enhancement for serious bodily injury would have been warranted in this case.

-13-

"extreme physical pain" and "protracted impairment of the function of a bodily member, organ, or mental faculty" are elements of the guidelines definition of serious bodily injury, see U.S.S.G. § 1B1.1 cmt. n.1(L) (2003),[6] while "substantial risk of death," "obvious disfigurement," and "loss of the function of a bodily member, organ, or mental faculty" are elements of the definition of permanent or life-threatening bodily injury, see U.S.S.G. § 1B1.1 cmt. n.1(J) (2003).[7] Because the jury's verdict may have been based on a finding that Roy was guilty only of causing extreme physical pain or some sort of protracted impairment, the district court's finding that the injury inflicted by Roy was actually more serious may have been based on facts not found by the jury. Alternatively, the jury's verdict may have been based on a finding that Roy actually caused a substantial risk of death, an obvious disfigurement, or the loss of a relevant bodily function, in which case the district court's enhancement would not be constitutionally objectionable.

Thus, even assuming that error occurred, we are unable to discern from the record whether that error is plain. For an error not raised below to be corrected, it must—at the very least—be plain at the time of appellate review. Johnson v. United States, 520 U.S. 461, 468 (1997). "'Plain' is synonymous with 'clear' or, equivalently, 'obvious.'" Olano, 507 U.S. at 734. Because it is not obvious that the district court committed any error at all, and is in fact equally plausible that the district court committed no error, Roy is not entitled to relief on his Sixth Amendment challenge.

---

[6]The guidelines define "serious bodily injury" as "injury involving extreme physical pain or the protracted impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation." U.S.S.G. § 1B1.1 cmt. n.1(L).

[7]The guidelines define "permanent or life-threatening bodily injury" as "injury involving a substantial risk of death; loss or substantial impairment of the function of a bodily member, organ, or mental faculty that is likely to be permanent; or an obvious disfigurement that is likely to be permanent." U.S.S.G. § 1B1.1 cmt. n.1(J).

Our disposition of Roy's Sixth Amendment claim, however, does not end our inquiry. In holding that the mandatory federal sentencing guidelines could not survive Sixth Amendment scrutiny, the Supreme Court declared the guidelines "effectively advisory." Booker, 125 S. Ct. at 757; United States v. Marcussen, 403 F.3d 982, 983 (8th Cir. 2005). Thus, we must consider whether the district court's act of sentencing Roy under the then-mandatory guidelines system constituted reversible error. Because this claim was also not raised in the district court, we again review for plain error. See United States v. Sayre, 400 F.3d 599, 600 (8th Cir. 2005).

It is clear, after Booker, that the district court's act of applying the guidelines in a mandatory fashion was erroneous. Such error, while perhaps not sufficiently plain at the time of sentencing, is certainly plain on appellate review. To demonstrate that the error affected his substantial rights, however, Roy "must show a 'reasonable probability,' based on the appellate record as a whole, that but for the error he would have received a more favorable sentence." Pirani, slip op. at 11. On the basis of the record before us, we cannot determine whether Roy has made such a showing without resorting to speculation. Accordingly, Roy has not met his burden. See id. at 12-13.

**B.**

Roy next asserts that the district court misapplied the sentencing guidelines in computing his sentence. We review the district court's application of the guidelines to the facts of each case *de novo* and its factual findings for clear error. United States v. Mathijssen, No. 04-1995, slip op. at 3 (8th Cir. May 2, 2005). After Booker, however, the guidelines are but one component of a district court's sentencing decision, see 125 S. Ct. at 767, and we accordingly review each sentence for unreasonableness, judging it with regard to the factors set forth in 18 U.S.C. § 3553(a).[8] Marcussen, 403 F.3d at 985.

---

[8]We reach the unreasonableness issue in this case because Roy, unlike the defendant in Mathijssen, raised a Blakely/Booker challenge to his sentence in

Among the factors that we consider when conducting our unreasonableness inquiry are: the applicable guidelines range for the offense of conviction; the nature and circumstances of the offense and the history and characteristics of the defendant; and the need for the sentence imposed to reflect the seriousness of the offense, to provide adequate deterrence, to promote respect for the law, and to provide just punishment. 18 U.S.C. § 3553(a). In the light of these factors, we conclude that the sentence imposed by the district court was not unreasonable.

Roy's only argument regarding the district court's guidelines computation is that the district court lacked sufficient evidence to impose the five-level enhancement to account for Van Roekel's injury pursuant to U.S.S.G. § 2A2.2(b)(3)(E). We disagree. Testimony at trial showed that the knife used by Roy to stab Van Roekel penetrated Van Roekel's entire abdominal wall, causing internal fatty tissue to protrude from the wound. Although none of Van Roekel's vital organs or blood vessels were harmed, the surgeon who operated on Van Roekel testified that the wound was potentially life threatening. In addition, the wound required exploratory surgery, caused Van Roekel a great deal of immediate pain and psychological distress (some of which has continued into the present time), and left a noticeable permanent scar. The district court thus had ample evidence from which to conclude that the injury sustained by Van Roekel was more serious than that encompassed by the guidelines definition of serious bodily injury, but less serious than that encompassed by the guidelines definition of permanent or life-threatening bodily injury.

Furthermore, we note that the district court at sentencing addressed Roy's history and characteristics and the nature and circumstances of the offense in

addition to his guidelines claim. See Mathijssen, slip op. at 4 ("Here, because Mathijssen has alleged only that the district court improperly applied the guidelines, and has not raised any general challenge to his sentence based on the Supreme Court's recent decisions, we apply *de novo* review, and do not need to reach the question of unreasonableness.").

determining the appropriate sentence within the applicable guidelines range. Although the district court did not explicitly address each of the 18 U.S.C. § 3553(a) factors, we are unable to say, based on the record, that the sentence it imposed was unreasonable.

The judgment is affirmed in part, reversed in part, and remanded to the district court for further proceedings consistent with this opinion.

_____