# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-2399

_____

United States of America,       *
           *
      Plaintiff - Appellee,       *
           *    Appeal from the United States
      v.       *    District Court for the
           *    District of Nebraska.
Ruben Lopez Cazares,       *
           *
      Defendant - Appellant.       *

_____

Submitted: December 11, 2007
Filed: April 10, 2008

_____

Before LOKEN, Chief Judge, WOLLMAN, and SHEPHERD, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

Ruben Lopez Cazares was convicted at a jury trial of conspiracy to distribute and to possess with intent to distribute 500 grams or more of a mixture containing methamphetamine. See 21 U.S.C. §§ 841(a)(1), (b)(2), 846. The district court[1] sentenced Cazares to 300 months of imprisonment to be followed by a five-year term of supervised release. On appeal, Cazares contends that he is entitled to a new trial because the district court erred in its interpretation and application of Federal Rule of Evidence 801(d)(2)(E). We affirm.

_____

[1]The Honorable Laurie Smith Camp, United States District Judge for the District of Nebraska.

I.

In light of the jury's guilty verdict, we recite the facts in the light most favorable to the government. See United States v. Jennings, 487 F.3d 564, 576 (8th Cir. 2007). From 2002 to his arrest in 2005, Cazares was involved in a substantial number of methamphetamine transactions with numerous individuals. During that time, Cazares both purchased methamphetamine and sold it to others. The quantities of methamphetamine involved in these transactions ranged from a one half-pound to nine pounds. Cazares's arrest arose out of a narcotics investigation geographically centered on Norfolk, Nebraska but also encompassing other states, including Kentucky. As part of the investigation, law enforcement wiretapped telephones connected to Jesus Padilla, a target of the investigation who ran a mechanic's shop in Norfolk. Cazares operated a used car business at the same location, and, though the two businesses maintained separate phone lines, they shared office space. Both Padilla's cell phone and the land line for his shop were tapped. Cazares's business line was not tapped; however, Cazares was recorded on a number of phone calls on Padilla's business line in which Cazares discussed methamphetamine transactions.

Toward the end of the investigation in 2005, Nebraska State Patrol Investigator Douglas L. Kelley, began working with Adrian Acosta, Cazares's cousin, who had been arrested on an unrelated drug offense. Acosta initially lied to law enforcement but eventually agreed to cooperate and told them about his involvement with Cazares relating to methamphetamine. Acosta stated that he had obtained methamphetamine from Cazares in 2002 as a way to make money. Cazares gave Acosta a cell phone box that contained four ounces of methamphetamine in exchange for Acosta agreeing to make payments over time. Acosta gave the methamphetamine to a friend to sell for him. However, because the drug was of poor quality, Acosta did not make enough money selling the methamphetamine to pay Cazares. On March 25, 2005, Acosta recorded a meeting with Cazares where Acosta renegotiated his drug debt. During the

meeting, Acosta informed Cazares of the poor quality of the methamphetamine, and Cazares agreed to reduce Acosta's debt from $4,000 to $3,000. The investigation was completed shortly thereafter, resulting in the arrest of over 30 individuals, including Cazares.

A federal grand jury indicted Cazares, alleging that the conspiracy existed from January 1, 2003 to March 30, 2005. A superceding indictment was subsequently filed, expanding the alleged time frame of the conspiracy from January 1, 1996 to March 30, 2005 and adding the following co-defendants: Genaro Favala Ramirez ("Genaro"), Candilaro Favala Ramirez ("Candilaro"), Hilario Felix, and Manuel Garcia. The case proceeded to a jury trial as to Cazares on March 6, 2007.

At trial, the government's case-in-chief consisted of the testimony of two law enforcement officials who were involved in the investigation, Federal Bureau of Investigation Special Agent Drew Armstrong and Investigator Kelley, and the testimony of eight cooperating witnesses (all of whom had been convicted of felony drug charges): Acosta; Candilaro; Padilla; Garcia; Mollie Moler (Padilla's ex-girlfriend); Scott Freese (Padilla's former attorney and friend); Benjamin Sukup (Padilla's main methamphetamine customer); and Juan Cuevas (observed Cazares sell methamphetamine on numerous occasions). The testimony of the cooperating witnesses indicated that Cazares was heavily involved with obtaining and distributing methamphetamine to numerous individuals.

Cazares offered two witnesses, a friend of the Cazares family, Rosa Rivas, and his wife, Indalecia Lopez. Rivas testified that she had never seen Cazares with drugs and that he was involved in religious activities. Indalecia testified that she had never observed drugs at her husband's business or at their house. On March 8, 2007, the jury returned a guilty verdict. On June 7, 2007, the district court sentenced Cazares to 300 months incarceration to be followed by a five-year term of supervised release.

In this appeal, Cazares challenges the district court's admission of testimony from six witnesses, Candilaro, Padilla, Moler, Freese, Sukup, and Cuevas, pursuant to Federal Rule of Evidence 801(d)(2)(E). More specifically, Cazares contends that the district court: (1) misinterpreted and misapplied Rule 801(d)(2)(E) by admitting a number of the witnesses' own conclusions based on out-of-court statements, as opposed to the out-of-court statements themselves and (2) by admitting out-of-court statements which the government failed to demonstrate were made in furtherance of any charged conspiracy. We summarize the testimony, objections, and rulings in question as follows:

## A. The Cooperating Witnesses

### 1. Candilaro Favala Ramirez

Candilaro testified that he supplied Padilla with methamphetamine from the end of 2003 to approximately October 2004. Candilaro stated that he made about 15 deliveries of methamphetamine, ranging from one to four pound quantities, to Padilla's shop every one to two weeks. Though Candilaro stated that he was not involved in drug transactions with Cazares, Candilaro said that he accompanied his roommate, Felix, to Norfolk on three occasions in 2003 and 2004 and that Felix twice delivered one-pound quantities and once delivered a two-pound quantity of methamphetamine to Cazares. Candilaro testified that, in addition to those three trips, Felix had delivered methamphetamine to Cazares several more times. When the government asked Candilaro how he knew this, Candilaro stated that he and Felix hung out together and talked. The government then asked Candilaro what Felix told him when they hung out. Cazares objected, asserting that the question called for a hearsay answer, and a bench conference ensued.

At the conference, the government stated that Felix's statement was being offered as a coconspirator statement made in the course of and in furtherance of the

conspiracy which is not hearsay under Rule 801(d)(2)(E).  Defense counsel responded that Felix's statement was not admissible pursuant to Rule 801(d)(2)(E) because the government had not shown that: (1) it was made in the course of a conspiracy of which Cazares was a member or (2) it was made in furtherance of a conspiracy because it addressed activity with which the listener, Candilaro, was not involved. Relying on United States v. Bell, 573 F.2d 1040 (8th Cir. 1978),[2] the district court conditionally allowed Felix's statement, noting that, at the close of the evidence, it would issue a ruling on the admissibility of the statement and, if the government had not met its burden, the court would either declare a mistrial or give a cautionary instruction.

Candilaro further testified, without a hearsay objection, that, on four or five occasions in 2003 and 2004, he overheard Felix speaking with Cazares over the phone, and that they were discussing Felix delivering methamphetamine to Cazares. Candilaro also stated that Felix sent an individual named Lionel to Norfolk to deliver methamphetamine and that Candilaro had accompanied Lionel on two occasions. Subsequently, the government asked Candilaro if he knew who Lionel was delivering drugs to, Candilaro responded that Lionel was delivering to Cazares.  Cazares then objected to foundation and requested that Candilaro's answer be struck; the district court overruled the objection.

---

[2]In United States v. Bell, 573 F.2d 1040 (8th Cir. 1978), this court held that a district court may conditionally allow testimony as to the statement of an alleged coconspirator subject to later proof, by a preponderance of independent evidence, that the declarant was a coconspirator and that the statement was during the course of and in furtherance of the conspiracy.  Id. at 1044.  If, at the close of the evidence, the government has failed to carry its burden of the proof, then district court will determine whether a cautionary instruction will correct the problem or whether a mistrial must be declared.  Id.

## 2. Jesus Padilla

Jesus Padilla testified that he sold methamphetamine to Cazares in quantities of one to two pounds and that he also obtained methamphetamine from Cazares in those same quantities. However, Padilla stated that he and Cazares were not partners in drug dealing. Padilla admitted that, after his arrest, he had several proffer interviews with law enforcement officers but did not discuss Cazares's involvement in illegal drug activity until the third interview. Padilla testified that Cazares began obtaining methamphetamine directly from Felix, the individual referenced by Candilaro, rather than going through Padilla. Padilla stated that he saw Felix deliver methamphetamine, in one to two pound quantities, to Cazares over 10 times.

Padilla also testified that he witnessed drug transactions between Cazares and Valentin, a drug dealer, on five to ten occasions from 2003 to 2004. Padilla stated that, in the course of those transactions, either Valentin delivered methamphetamine to the shop or Cazares sent Padilla to Valentin's house to pick it up. Padilla testified that Valentin obtained a 1998 Ford Expedition from Cazares in exchange for methamphetamine that Padilla picked up for Cazares at Valentin's house. Padilla stated that he sold the methamphetamine and gave Cazares the money.

Padilla further testified that, toward the end of 2004, he obtained methamphetamine from Cazares for Sukup. Padilla addressed the contents of three phone calls involving Cazares, Padilla, and Sukup: (1) on October 17, 2004, Cazares asked Padilla about Sukup because Cazares wanted Padilla to collect money from Sukup for methamphetamine; (2) on November 24, 2004, Cazares asked Padilla to determine whether Sukup wanted to purchase more methamphetamine, and Padilla inquired about a sample of methamphetamine that Cazares was to leave in Padilla's work shirt (which Padilla later found there); and (3) on January 27, 2005, Cazares asked Padilla if he had talked to Sukup about methamphetamine, Padilla replied that

Sukup wanted a "photo," meaning a sample of methamphetamine, and Cazares agreed to take a sample to Padilla's house.

In addition, Padilla testified that, in 2002, he observed a drug deal between Cazares and Genaro involving methamphetamine and a vehicle. Cazares raised a hearsay objection to Padilla relaying a statement of Genaro's. Genaro's statement was that Cazares owed him money for methamphetamine and a vehicle. The government responded that the statement was not hearsay under Federal Rule of Evidence 801(d)(2)(E). The district court conditionally allowed the statements into evidence under Bell. Padilla also testified as to the contents of a recorded phone call from October 27, 2004 in which Cazares offered to send money to Genaro. Padilla stated that Cazares did this because Cazares still owed Genaro money from the aforementioned drug deal and that both Genaro and Cazares had informed him that this was the case.

Padilla also testified about Rene Rico, who had a body shop outside of Norfolk. Padilla stated that he had observed a cutting agent for methamphetamine at Rico's shop and that Cazares had told Padilla that Rico was a drug dealer. Padilla also testified to a number of statements that Cuevas made to Padilla concerning Rico which Cazares objected to as hearsay. Cuevas's statements, relayed by Padilla, were that: (1) Cuevas and Rico had a drug relationship; (2) that the drugs left in Cuevas's car, when Cuevas came to the shop to deliver drugs to Padilla and Cazares, were for Rico; and (3) that Rico and Cuevas were involved in methamphetamine deals together. Cazares also raised a hearsay objection to Padilla relaying Rico's statement that Rico and Cuevas engaged in methamphetamine transactions.

Padilla also discussed Adrian Acosta, whom he saw in the shop in March of 2005, stating that Cazares told Padilla that Acosta owed Cazares money from a transaction. Padilla further testified regarding Enrique Zamora Garcia ("Enrique"), stating that Padilla went to Enrique's residence in Kentucky in late 2004 and 2005.

Padilla discussed the contents of a December 15, 2004 phone conversation involving Cazares, Padilla, and Enrique. During the call, Enrique stated that he had not sent Cazares his money because Enrique had his "car parked," meaning he had not yet sold the drugs that were in his possession. Padilla also addressed one specific interaction he had with his ex-girlfriend, Mollie Moler, whom he lived with from 1997 to 2004. Padilla stated that, on one occasion at Moler's house, she picked up his jacket and found a package containing one pound of methamphetamine. Padilla testified that she got mad because she did not want drugs in the house, and Padilla told her that the package belonged to Cazares.

### 3. Mollie Moler

Moler testified to the incident involving the drugs she found in Padilla's coat, stating that, when she confronted Padilla about the drugs, he told her the drugs belonged to Cazares. The defendant objected to Padilla's statement to Moler as hearsay, and the district court conditionally admitted the statement under Bell.

### 4. Scott Freese

Scott Freese, a former attorney who had represented Padilla, testified that he developed a friendship with Padilla and spent time socializing at his shop. The government asked Freese what he "learned from Jesse Padilla that indicated to you [that] [Cazares] was involved in drug dealings?" Cazares objected, citing both hearsay grounds and on the basis that the question called for an opinion or a narrative conclusion. With respect to the hearsay objection, the district court stated that Freese's response would be conditionally admitted in keeping with Bell; the district court did not address Cazares's alternative objection. Freese responded, stating in part that, Padilla told him that the rumors of drug activity out of his shop were a result of Cazares's actions. At that point, Cazares renewed his objection.

During the bench conference following Cazares's objection, defense counsel moved for a mistrial because Freese had testified to his opinion based on out-of-court statements rather than relaying the statements themselves such that his testimony was beyond the scope of Federal Rule of Evidence 801(d)(2)(E) and Bell. The government responded that the question sought to elicit a statement and that Freese's response was admissible as a nonhearsay statement under Rule 801(d)(2)(E).[3] The district court determined that the response was narrative and that it did not fall within the confines of Rule 801(d)(2)(E) because it was not made in the course of and in furtherance of the conspiracy. As a result, the district court instructed the jury to disregard Freese's response but denied the motion for a mistrial.

## 5. Benjamin Sukup

Benjamin Sukup testified that he initially obtained methamphetamine to sell from Garcia but later obtained methamphetamine from Padilla and became Garcia's supplier. Sukup testified to Cazares's involvement with Garcia. Cazares lodged a hearsay objection to Sukup's testimony that, after he returned from a trip to Mexico with Padilla toward the end of 2002, Garcia informed him that he could obtain methamphetamine for a lower price from Cazares. The defendant also raised a hearsay objection to Sukup's testimony that, on one occasion, Garcia stated that he needed to pay Cazares for drugs. The district court conditionally admitted the

---

[3]The government also contended that Padilla's statement, relayed by Freese, was not hearsay under Federal Rule of Evidence 801(d)(1)(B). See Fed. R. Evid. 801(d)(1)(B) (providing that an out-of-court statement offered for the truth of the matter asserted is not hearsay if it is "consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication . . . ."). The government asserted that defense counsel had cross-examined Padilla in such a way as to indicate that Padilla recently had a motive to fabricate testimony, the criminal charges against him, and his statement to Freese occurred before the alleged motive to fabricate arose such that it was admissible under Rule 801(d)(1)(B). The district court did not issue a ruling on this matter.

statements under <u>Bell</u>. Sukup further testified that he rode with Garcia to the shop where he saw Garcia take a "wad of cash," approximately $2,500, into the shop and speak with Cazares. Garcia later admitted in his testimony that: (1) beginning in March or April of 2003, Cazares sold him methamphetamine a number of times in one-half to one pound quantities; (2) during one transaction, Garcia obtained five pounds of methamphetamine from Cazares, which Garcia redistributed to Sukup; and (3) in total, Garcia purchased eight to ten pounds of methamphetamine from Cazares.

In addition, Sukup stated that he received a sample of methamphetamine from Cazares in the fall of 2004. Sukup also stated that Cazares said if Sukup needed anything in the future he could contact Cazares. Sukup testified that he never directly purchased methamphetamine from Cazares and continued to buy from Padilla. The defendant objected to Sukup relaying Padilla's statement that Cazares obtained methamphetamine from Padilla as hearsay. The district court conditionally admitted the testimony under <u>Bell</u>. Sukup also testified about a January 29, 2005 recorded phone call involving him, Padilla, and Cazares. During the call, Sukup told Cazares that Sukup had something Cazares might like, meaning money. Sukup explained that Cazares had provided a pound of methamphetamine to Padilla, and Padilla had asked Sukup to "get rid of it." However, Sukup stated that the drugs were of a poor quality so that Sukup was only able to sell about half of it. Sukup stated that, after the January 29th call, he met Padilla and Cazares and made a partial payment.

### 6. Juan Cuevas

Juan Cuevas testified that he witnessed (while hidden) Cazares deliver methamphetamine to Rico eight to ten times at approximately one-month intervals from 2002 to late 2004. Cuevas stated that the quantities of methamphetamine involved in the transactions he observed ranged from two to nine pounds. Cuevas explained that Rico asked Cuevas to observe the transactions due to a dispute that had arisen between Cazares and Rico. Cuevas stated that, during this time, he obtained

small quantities of methamphetamine from Rico a number of times. Cazares lodged a hearsay objection to Cuevas's testimony that Rico stated that the bag that he had received from Cazares contained methamphetamine. The district court conditionally admitted the statement under Bell. Cuevas further stated that he witnessed Cazares attempt to collect money from Rico for methamphetamine in the summer of 2004 but that Cazares was unable to do so because Rico had not yet collected from the buyer. Cuevas also testified that he went to Padilla's shop to sell marijuana to Padilla and to socialize. During a visit in the summer of 2004, Cuevas noticed a vehicle with Kentucky license plates at the shop. On that same occasion, Cuevas saw Cazares speaking with another person in the shop office, and they had what Cuevas believed to be a package of methamphetamine.

## B. The District Court's Bell Rulings

At the close of the evidence, the district court, in keeping with the Bell procedure, addressed whether the government had carried its burden under Federal Rule of Evidence 801(d)(2)(E) with respect to the statements that had been conditionally admitted pursuant to the rule. Rule 801(d)(2)(E) provides that

> "[A] statement is not hearsay if it was made by a party's coconspirator during the course and in furtherance of the conspiracy." The government bears the burden of proving by a preponderance of the evidence that "(1) a conspiracy existed, (2) both the declarant and [Cazares] were members of the conspiracy, and (3) the declarant made the statement in the course and in furtherance of the conspiracy."

Jennings, 487 F.3d at 583 (internal citation omitted) (quoting United States v. Mahasin, 362 F.3d 1071, 1084 (8th Cir. 2004)).

The district court noted that, in some instances where Cazares had objected to a question as eliciting hearsay, the witness's answer was actually the witness's own

-11-

statement such that it was not hearsay. The court then addressed whether the government had satisfied its burden of proof under Rule 801(d)(2)(E) with respect to the following out-of-court statements: (1) Felix's statement to Candilaro that Felix sent Lionel to deliver drugs to Cazares;[4] (2) Genaro's statement to Padilla that Cazares owed Genaro money for drugs and a vehicle; (3) Cuevas's statement to Padilla that Cuevas and Rico had a drug relationship; (4) Cuevas's statement to Padilla that the drugs remaining in Cuevas's car were for Rico; (5) Cuevas's statement to Padilla that Cuevas and Rico were involved in methamphetamine deals together; (6) Rico's statement to Padilla that Rico and Cazares were involved in methamphetamine deals together; (7) Padilla's statement to Moler that the drugs Moler found in Padilla's coat were Cazares's; (8) Garcia's statement to Sukup that Garcia could get methamphetamine for a lower price from Cazares; (9) Garcia's statement to Sukup that Garcia needed to pay Cazares for some methamphetamine; (10) Padilla's statement to Sukup that Cazares purchased methamphetamine from Padilla; and (11) Rico's statement to Cuevas that the bag that Rico had just recieved from Cazares contained methamphetamine. The district court found that the government had shown that each of the six out-of-court declarants, Felix, Genaro, Cuevas, Rico, Padilla, and Garcia, were Cazares's coconspirators and that the statements were admissible.[5]

---

[4]However, Cazares's objection to this statement was to foundation, not hearsay, and the district court overruled the foundation objection such that the statement is not within the purview of this appeal.

[5]Though Cazares has not challenged the lack of an express finding with respect to Federal Rule of Evidence 801(d)(2)(E)'s "in the course of and in furtherance of the conspiracy" requirement, we note that the district court's substantial compliance with the Bell procedure is sufficient. See United States v. England, 966 F.2d 403, 407-08 (8th Cir. 1992) ("[T]he [district] [c]ourt made an explicit on-the-record ruling that the government had met its burden and that the challenged statements were admissible. Thus, the [court] substantially followed the Bell procedure. That is all our cases require." (internal citation omitted)).

## II.

We review the district court's interpretation of Federal Rule of Evidence 801(d)(2)(E) de novo, see United States v. Roy, 408 F.3d 484, 492 (8th Cir. 2005), and review the district court's admission of the out-of-court statements as coconspirator statements made during and in furtherance of the conspiracy under Rule 801(d)(2)(E) for an abuse of discretion, "keeping in mind that its discretion is particularly broad in a conspiracy trial." United States v. Davis, 457 F.3d 817, 824-25 (8th Cir. 2006), cert. denied, 127 S. Ct. 1386 (2007) (quoting United States v. Jordan, 260 F.3d 930, 932 (8th Cir. 2001)).

## III.

We first address Cazares's contention that the district court erred by admitting testimony as an out-of-court declaration that met the requirements of Federal Rule of Evidence 801(d)(2)(E) when, in actuality, the testimony was not an out-of-court declaration but the witness's own conclusion based upon the out-of-court declaration. Cazares correctly asserts that admitting such testimony under the guise of Rule 801(d)(2)(E) would be improper. However, after careful review of the record, we see only one instance where this was potentially the case,[6] the testimony from Scott Freese which the district court struck and instructed the jury to disregard. Thus, Freese's statements are irrelevant for purposes of this appeal.

---

[6]Though Cazares raises this point with respect to Candilaro's testimony, we need not address it. The government did ask Candilaro: (1) "From talking to Hilario Felix and Lionel, who was Lionel delivering methamphetamine to?" and (2) "From talking with Hilario Felix and Lionel, who was Lionel taking methamphetamine to?" However, the record shows that Candilaro, for various reasons, did not respond to either question.

We next consider Cazares's argument that the government failed to show, by a preponderance of the evidence, that the out-of-court statements at issue were in furtherance of a conspiracy. Though "we interpret the phrase 'in furtherance of the conspiracy' broadly, 'a statement that simply informs the listener of the declarant's criminal activities is not made in furtherance of the conspiracy.'" Davis, 457 F.3d at 825 (quoting United States v. McKay, 431 F.3d 1085, 1093 (8th Cir. 2005), cert. denied, 547 U.S. 1174 (2006), and 127 S. Ct. 46 (2006)). Coconspirator statements are in furtherance of the conspiracy if they "discuss the supply source for the illegal drugs . . . or identify a coconspirator's role in the conspiracy . . . ." Id.; see Jordan, 260 F.3d at 933 ("A statement informing a coconspirator of the methods of obtaining [drugs] is admissible because it is designed to help ensure continued involvement."). In light of these standards, we conclude that the district court did not abuse its considerable discretion with respect to the admission of the aforementioned statements, excepting Padilla's statement relayed by Moler, because the statements were in furtherance of the conspiracy where each of them identifies one or more of the following: participants in the conspiracy; their roles in the conspiracy; the method of distribution; or the source for the drugs that are the subject of the conspiracy. See Davis, 457 F.3d at 825; Jordan, 260 F.3d at 933.

Finally, we address the two remaining out-of-court statements in this appeal: (1) Padilla's statement, relayed by Moler, that the drugs she found in his jacket belonged to Cazares and (2) Felix's statement, relayed by Candilaro (which the district court did not consider in its Bell rulings), that Felix made methamphetamine deliveries to Cazares in addition to those on which Candilaro accompanied Felix. Even if these statements were admitted in error, it was harmless because the government presented additional, and much more substantial, evidence linking Cazares to the conspiracy, including the testimony of three individuals, Padilla, Garcia, and Acosta, that they received methamphetamine directly from Cazares; the recorded phone conversations; the recorded meeting between Acosta and Cazares regarding Acosta's drug debt; and Cuevas's testimony that he saw Cazares deliver methamphetamine to Rico on multiple

-14-

occasions.  See United States v. Singh, 494 F.3d 653, 659 (8th Cir.), cert. denied, 128 S. Ct. 528 (2007) (providing that an error in the admission of evidence is only a basis for relief if the error affected the defendant's "substantial rights" (quoting Fed. R. Crim. P. 52(a)); United States v. Sanchez-Godinez, 444 F.3d 957, 961 (8th Cir. 2006) ("An evidentiary error is harmless if the substantial rights of the defendant were unaffected and the error did not influence or had only a slight influence on the verdict." (citation and internal quotation marks omitted)); see also United States v. Hyles, 479 F.3d 958, 969 (8th Cir. 2007) (any error in admission in prosecution for murder-for-hire of witness's testimony that, after the murder, coconspirator stated that the defendant had told him he could have defendant's car, was not prejudicial because the outcome of the trial would not have been different since there was other evidence linking coconspirator and the car to the conspiracy).

IV.

For the foregoing reasons, we affirm the judgment of the district court.

_____