# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-1381

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Plaintiff - Appellee, | * | |
| | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the Eastern |
| | * | District of Missouri. |
| Tyrese D. Hyles, also known as | * | |
| Little Ty, | * | |
| | * | |
| Defendant - Appellant. | * | |

_____

Submitted: October 19, 2006
Filed:   March 21, 2007

_____

Before MELLOY, BENTON, and SHEPHERD, Circuit Judges.

_____

MELLOY, Circuit Judge.

Tyrese Hyles was indicted on murder-for-hire charges pursuant to 18 U.S.C.
§ 1958(a) and conspiracy to commit murder-for-hire charges pursuant to 18 U.S.C.
§ 2.  The government sought the death penalty.  After hearing the evidence at trial,
a jury convicted Hyles of both charges.  At sentencing, the jury declined to sentence
Hyles to death, instead sentencing him to life in prison without the possibility of

parole. Hyles appeals his conviction, challenging the district court's[1] denial of his motion to suppress a videotaped statement and several other evidentiary rulings by the court. We affirm.

I.    Background

The facts of this case are set forth in our panel's opinion in United States v. Cannon, 475 F.3d 1013 (8th Cir. 2007). We repeat the facts here only as relevant to Hyles's claims on appeal.

In the early morning hours of August 21, 2000, police found Coy Smith shot to death in his bed. Smith was a private citizen who had been working with law enforcement in the area to make controlled drug purchases from local drug dealers. On August 10, 2000, Smith had testified against Hyles at a preliminary hearing in a state drug case. At the time of Smith's murder, Hyles was being held in Pemiscot County Jail in Caruthersville, Missouri pending trial in the state drug prosecution. Co-defendant Amesheo Cannon, a close friend of Hyles, lived in Memphis, Tennessee, where he was under parole supervision. Tonya Johnson Hyles ("Tonya"), Hyles's wife, lived in Caruthersville, Missouri.

Following Smith's testimony, David Carter, Hyles's cellmate in the Pemiscot County Jail, agreed to murder Smith in exchange for having Tonya bail him out of jail. Tonya bailed Carter out that same day, using a Pontiac Parisienne she and Hyles owned as collateral. Carter never killed Smith; instead, Hyles and Cannon agreed that Cannon would drive from Memphis, Tennessee to Caruthersville, Missouri for the purpose of killing Smith. In exchange for Smith's murder, Cannon received the Pontiac Parisienne.

---

[1]The Honorable Henry Edward Autrey, United States District Judge for the Eastern District of Missouri.

A.     Charges

On June 5, 2001, Hyles was charged in a federal complaint with the murder-for-hire of Coy Smith. Tonya was also charged in the complaint. Hyles was arrested on June 11, 2001, and detained in Jackson, Missouri on federal charges. An attorney made an appearance in federal court on Hyles's behalf. Shortly thereafter, the Pemiscot County prosecutor in Caruthersville, Missouri issued state charges against Hyles for the murder of Smith. On June 15, 2001, the federal complaint was dismissed without prejudice in favor of the state charges, and Hyles was brought into state custody in Caruthersville. While en route to Caruthersville, Hyles indicated that he was interested in talking to the transporting officers, and he ultimately made a videotaped statement.

On October 18, 2001, a federal grand jury returned an indictment against Hyles and co-defendant Cannon for murder-for-hire and conspiracy to commit murder-for-hire, in violation of 18 U.S.C. §§ 1958(a) and 2. Hyles remained in state custody in Caruthersville. On December 13, 2001, the government filed a superseding indictment, which restated and refined the same charges against Hyles and Cannon. Hyles was brought into federal custody on December 17, 2001. The government filed a second superseding indictment against Hyles and Cannon on November 21, 2002, adding grand jury findings of aggravated circumstances. The government sought the death penalty against both defendants. On June 27, 2003, the court severed the parties for trial. Hyles's state charges remained pending until June 2003.

B.     Motion to Suppress Statements

On February 11, 2002, Hyles filed a Motion to Suppress Statements. In his motion, Hyles argued that "any alleged statements the Government intend[ed] to use" against him were involuntary, were obtained in violation of the Fifth Amendment of the United States Constitution, and were the result of an unlawful arrest. The court

held a suppression hearing on June 27, 2002, and heard testimony regarding the videotaped statement Hyles gave during his transportation from federal to state custody on June 15, 2001, and the events leading up to the statement. Hyles did not present any testimony in support of his motion at the suppression hearing.

During the hearing, Caruthersville Police Sergeant Robert Lockett and Officer Tina Cruz, an agent with the Bootheel Drug Task Force, testified to the following. On June 15, 2001, Lockett and Cruz transported Hyles from federal custody in Jackson, Missouri to the custody of the Pemiscot County Sheriff in Caruthersville, Missouri. En route to Caruthersville on Interstate 55, Hyles indicated that he wanted to talk to Lockett in an attempt to help his wife, Tonya, who was also facing federal charges in the case. Lockett told Hyles that he could not talk to him and attempted to contact the Assistant United States Attorney and the Pemiscot County prosecutor familiar with the case for legal advice. Because Hyles continued to ask to talk to him, Lockett pulled his vehicle to the shoulder of the highway and read Hyles his Miranda rights, including his right to talk to a lawyer. Hyles stated he understood his rights and persisted in his desire to talk to Lockett. However, no questions regarding Smith's murder were asked of Hyles at this time. Hyles did not request an attorney or invoke any other rights.

After talking to an officer of the Missouri State Highway Patrol, Lockett decided that Hyles could make a videotaped statement at the Highway Patrol office in Sikeston, Missouri. At the Highway Patrol office, Cruz obtained a Missouri State Highway Patrol notification and waiver of rights form. Cruz advised Hyles of his Miranda rights a second time, and Hyles executed the form, waiving his rights. While executing the waiver form, Hyles did not request an attorney or otherwise invoke his rights.

Lockett did not interview Hyles until he contacted the Pemiscot County prosecutor and allowed Hyles to talk to the Pemiscot County prosecutor. The

Pemiscot County prosecutor indicated to Hyles that giving a statement would help Tonya. Hyles then gave a videotaped oral statement to Lockett, Cruz, and the state patrol officer. During the time spent at the Highway Patrol office, Hyles was provided with lunch, was permitted to use the restroom, and was allowed to smoke outside.

On the videotaped statement, Lockett and Hyles reviewed the events leading up to the statement, including the fact that Lockett had advised Hyles of his Miranda rights on Interstate 55 and that Cruz had advised Hyles of his Miranda rights a second time with a Highway Patrol form. Lockett then advised Hyles of his Miranda rights a third time on videotape. Hyles said that he understood his rights, and agreed to waive his rights and to willingly make a statement. Hyles stated that he was talking to the officers "of his own free will."

Hyles then admitted that he spoke with Cannon, who he called his "partner," after he learned that Coy Smith was a witness in Hyles's state drug case. Hyles said that Cannon told him not to worry because Cannon did not think Smith would testify. If Smith did testify against Hyles, Cannon told Hyles, Cannon would "handle that" for Hyles. Hyles stated that he understood that Cannon would kill Smith if he testified.

Hyles then said that after Smith testified at Hyles's preliminary hearing, Hyles talked to Cannon on the telephone. Cannon repeated that he would "handle that" for Hyles, which Hyles understood to mean killing Smith. Hyles stated that Cannon's reason for driving to Caruthersville, Missouri from Memphis, Tennessee was to kill Smith for him.

According to Hyles, his cellmate at the Pemiscot County Jail, David Carter, also talked about killing Smith for Hyles. Hyles agreed to bail Carter out of jail the

same day, but denied that he did so to facilitate the murder of Smith or that he offered Carter anything in return for killing Smith.

Hyles stated that after Smith's death, Cannon told Hyles that he had killed Smith. Cannon told Hyles that he made a mask out of a scarf, went to Smith's house, cut the telephone wires, entered through the front door, and shot Smith. Hyles admitted that Cannon killed Smith on behalf of Hyles, but denied that he promised Cannon anything in return. Hyles did not indicate at any time during the interview that he wanted to have a lawyer present. After the statement, Lockett and Cruz delivered Hyles to Caruthersville. Lockett and Cruz were the only witnesses at the suppression hearing.

Following the suppression hearing, a magistrate judge filed a report and recommendation recommending that Hyles's motion be denied. Hyles objected to several of the magistrate judge's findings of fact, asserting for the first time that the government intentionally created a gap in legal representation between Hyles's federal and state charges in order to obtain a statement from him, thus, violating his Sixth Amendment right to counsel. Despite these objections, the district court adopted the report and recommendation. The court found that it was Hyles who initiated the conversation with Lockett while Hyles was being transported, that Hyles was advised of his Miranda rights three times, that Hyles was asked if he understood those rights, and that Hyles said he did. The court found that at no time prior to or during the videotaped conversation did Hyles express a desire to remain silent or to have an attorney present. He was allowed to smoke and was given lunch during the interview, and his demeanor during the interview was calm. Further, the court found that it was Hyles who set forth the conditions of his giving a statement. This fact, the court stated, "indicates that [Hyles] felt neither threatened nor coerced." A transcript of the videotape, but not the video itself, was introduced at trial.

-6-

C.      Motion to Exclude Recorded Jail Telephone Calls or Alternatively for a Continuance

The government obtained via subpoena recorded telephone conversations from the jails in which Hyles and Cannon were being held. The recorded conversations were preserved on CDs and were being monitored by the government primarily to protect the safety of its witnesses. Hyles had received a number of these CDs from the government, but objected to the final six CDs he had received from the government on April 29, 2005, ten days before trial was scheduled to begin. According to Hyles, these six CDs totaled over seventy-eight hours of Hyles's recorded telephone conversations. The government had obtained these CDs between three and nine weeks before it turned them over to Hyles. Before trial, Hyles moved to exclude from evidence the most recent recorded jail telephone conversations for failure of the government to disclose them in a timely manner under Federal Rule of Criminal Procedure 16(a)(1)(B)(i). In the alternative, he moved to continue the trial for six to eight weeks in order to have sufficient time to review the conversations.

During a hearing on the motion, Hyles acknowledged that the government had given him a list of twenty-five recorded conversations it might use at trial. He argued that regardless of the list provided by the government, he would still need to sift through all of the conversations in order to avoid missing any mitigating or exculpatory evidence. This task, he argued, was impossible for him to accomplish while preparing for trial. The government explained that Hyles continued to talk on the telephone while it was trying Cannon's nearly month-long trial, which delayed review of the recorded conversations. According to the government, as soon as it was able to review the tapes and determine their contents, it produced them. In some cases, delay was caused because of concerns about the safety of witnesses and possible attempts to influence them. Further, the government argued that the issue was moot because it had already narrowed down the number of conversations it would potentially use at trial. The district court held the motion in abeyance at

-7-

Hyles's request until Hyles could determine what was on the list the government provided.

Hyles renewed his motion on the first day of voir dire. He stated that he had been given eleven additional hours of recorded conversations during the week before trial, and that he found it impossible to do an appropriate review. According to Hyles, his counsel could not "be a reasonably competent attorney in this case under the circumstances." The government confirmed that it intended to introduce "very few if any tapes" in its case in chief during the guilt phase, and that it would provide Hyles advance notice if it did intend to use any of the calls. The government also reiterated that these recorded conversations were "equally available to the defense." The district court denied the lengthy continuance Hyles requested, but offered to consider a shorter continuance if the issue presented itself at trial. None of the calls were offered at trial.

D.    Trial

Included in the government's evidence was a photograph depicting the Pontiac Parisienne automobile that was payment for the murder-for-hire and two photographs of Hyles and Cannon posing together. The three photographs were found in Cannon's jail property and have writing on the back associating Hyles and Cannon. On the back of the picture of the Pontiac was written "Da-Pony G' 'Ride.'" The two pictures of Hyles and Cannon had "'2' of Da Most Wanted" and "'Bo$$' Playa's 2-Da-Casket ↓" written on the back, respectively. The government offered the photographs and the writing on the back as evidence of the importance of the Pontiac to Cannon, and to show Hyles's association with Cannon in the conspiracy case. The district court allowed the writings on the back of the photographs into evidence over foundation and hearsay objections from Hyles.

The government also introduced the testimony of Omar Wiley and Captain Tony Jones of the Caruthersville Police Department regarding statements made by Cannon. Wiley testified that Cannon was at Wiley's house on the afternoon before Smith's murder. While the two were sitting on the porch, Coy Smith drove by. Wiley testified that when Cannon saw Smith, he told Wiley, "I'm gonna kill that nigger . . . Nigger got my boy." Wiley also testified that after Smith's murder he observed Cannon and Tonya arguing over the Pontiac. Jones testified that he pulled Cannon over on August 29, 2000, and issued Cannon a traffic summons. Cannon was driving the Pontiac. Jones testified that he told Cannon to stop threatening Tonya about the vehicle and informed Cannon that the vehicle was marital property. Cannon responded that "Tyrese had told him he could have the vehicle." The government offered the statements as co-conspirator statements made in furtherance of the murder-for-hire conspiracy and as statements against interest. The district court admitted these statements over Hyles's hearsay objections.

April Leatherwood, Cannon's ex-girlfriend, testified at trial during the government's case-in-chief. Several days later, and after Leatherwood had returned to her home in Caruthersville, Hyles sought to introduce excerpts of recorded jail telephone conversations between her and Cannon. The recorded conversations were offered to impeach statements Leatherwood had made during her testimony. The court ruled that there had not been sufficient compliance with the requirements of Federal Rule of Evidence 613(b) and that the evidence was cumulative, and excluded the conversations.

Hyles also called witnesses, including his former attorney who had represented him in the underlying state drug case in which Smith was a witness. During his examination of his former attorney, Hyles asked about discussions the former attorney had with Hyles. The district court allowed the government to cross-examine Hyles's former attorney. The government agreed to limit its questions to facts the former attorney knew "from any source."

The jury convicted Hyles on both counts. After a separate penalty phase, the jury recommended sentences of life imprisonment without the possibility of parole. Hyles appeals, arguing that the district court erred by: (1) denying his motion to suppress his videotaped statement; (2) denying his motion to exclude his recorded jail telephone conversations, or, in the alternative, by denying his motion for a continuance to review the CDs; (3) admitting the writings on the back of photographs; (4) excluding recorded telephone conversations between Cannon and Leatherwood; (5) admitting Cannon's statements through the testimony of Wiley and Jones; and (6) allowing limited cross-examination of Hyles's former attorney. We discuss each in turn.

II.     Analysis

    A.     Motion to Suppress Hyles's Videotaped Statement

Hyles argues that the district court erred in denying the motion to suppress his videotaped statement. Hyles contends that his Sixth Amendment right to counsel was violated and that his statement was involuntary. When reviewing a district court's denial of a motion to suppress, we review the court's factual findings for clear error and its legal conclusions de novo. United States v. Judon, 472 F.3d 575, 581 (8th Cir. 2007). "We will affirm the denial of a motion to suppress unless the decision is unsupported by substantial evidence, is based on an erroneous view of the applicable law, or in light of the entire record, we are left with a firm and definite conviction that a mistake has been made." Id. (internal marks omitted).

Hyles first argues that his statement should be suppressed because it was obtained in violation of his Sixth Amendment right to counsel. Specifically, Hyles contends that the federal and state authorities worked together to create a gap in legal representation, and then exploited that gap for the purpose of obtaining a statement from him by placing him in a car with one of the officers involved in his case. The

-10-

government argues that Hyles has waived his Sixth Amendment claim because he did not raise it in his pretrial motion to suppress, and that even if not waived, his Sixth Amendment claim has no merit.

We need not address the question of waiver because Hyles's Sixth Amendment claim fails on the merits. The parties agree that Hyles's right to counsel had attached before he was transported by Lockett and Cruz. Hyles's waiver of his Miranda rights is enough to establish a knowing and intelligent waiver of counsel as long as that waiver was valid and as long as Hyles had not invoked his right to counsel before he waived his rights. See Patterson v. Illinois, 487 U.S. 285, 296 (1988) (holding that an accused who has been advised of his Miranda rights "has been sufficiently apprised of the nature of his Sixth Amendment rights, and of the consequences of abandoning those rights, so that his waiver on this basis will be considered a knowing and intelligent one"); Michigan v. Harvey, 494 U.S. 344, 349 (1990). Further, even if Hyles had asserted his right to counsel, the court found that he, rather than the officers, initiated the interrogation. See id. at 352 ("[N]othing in the Sixth Amendment prevents a suspect charged with a crime and represented by counsel from voluntarily choosing, on his own, to speak with police in the absence of an attorney."); Owens v. Bowersox, 290 F.3d 960, 962-63 (8th Cir. 2002) (stating that a defendant initiates interrogation if he "evinces a willingness and a desire for a generalized discussion about the investigation") (internal marks omitted). We agree with the district court's conclusion that Hyles's Sixth Amendment rights were not violated.

Hyles also contends that his statement should be suppressed because it was obtained in violation of his Fifth Amendment privilege against self-incrimination. The district court found that Hyles knowingly and intelligently waived his Miranda rights three times, and after reviewing the record, we agree. There was no violation of Hyles's Fifth Amendment right against self-incrimination.

-11-

Hyles further alleges that his statement was coerced in violation of his Due Process rights. "'A statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination.'" Judon, 472 F.3d at 581 (quoting United States v. LeBrun, 363 F.3d 715, 724 (8th Cir. 2004) (en banc)). When determining the voluntariness of a confession, we examine the totality of the circumstances. Id.

As the district court found, Hyles was allowed to smoke before the videotaping began. He was given lunch, and was allowed to use the bathroom if needed. The statement was given in a question and answer method, and Hyles appeared to be calm and comfortable. Hyles and the officers were at the Highway Patrol office no more than five or six hours. We agree that the length of the event "was in no way excessive or burdensome." Hyles argues that he was implicitly coerced into giving the statement because of the Pemiscot County prosecutor's promise to Hyles that if he gave a statement, it would help his wife, Tonya. However, there is no evidence in the record indicating that Hyles's will was overborne. Hyles himself asked the Pemiscot County prosecutor about the possibility of helping his wife. After the Pemiscot County prosecutor advised him that it would help Tonya, Hyles asked about himself. Hyles was told that the Pemiscot County prosecutor could not tell him anything about what would happen to him. Based on the totality of the circumstances, we agree with the district court's decision that Hyles's statement was voluntary.

B.     Motion to Exclude Audiotapes of Hyles's Jail Phone Calls

Hyles argued pre-trial that the seventy-eight hours of recorded conversations should be excluded so he would not have to waste valuable pre-trial preparation time reviewing them. Hyles now argues the government violated Federal Rule of Criminal Procedure 16 by not producing the calls in a timely manner. Alternatively, Hyles argues that the district court abused its discretion by denying his motion for a six to

eight week continuance to listen to the conversations and prepare for trial. We affirm the district court's decision on both issues.

Rule 16(a)(1)(B)(i) requires that, upon the defendant's request, the government disclose "any relevant written or recorded statement by the defendant if: the statement is within the government's possession, custody, or control; and the attorney for the government knows–or through due diligence could know–that the statement exists[.]" "The district court has broad discretion in fashioning sanctions for violations of Rule 16 . . . ." United States v. Flores-Mireles, 112 F.3d 337, 340 (8th Cir. 1997). Thus, even if we were to find a violation of Rule 16 in this case, exclusion of the CDs would not necessarily be required. See id. at 340-41 (holding that, despite a Rule 16 violation, the district court did not abuse its discretion by rejecting defendant's request to exclude recorded statements made by the defendant). The district court determined that if issues regarding the CDs arose at trial, Hyles would receive a short continuance to review the CDs. This decision was within the court's discretion and we find no error.

Hyles next argues that the district court erred in denying his motion for a continuance. District courts have broad discretion to deny requests for continuances. United States v. Urben-Potratz, 470 F.3d 740, 743 (8th Cir. 2006). As a general matter, continuances are not favored and should be granted only when the requesting party has shown a compelling reason. Id. "We will reverse a district court's decision to deny a motion for continuance only if the court abused its discretion and the moving party was prejudiced by the denial." United States v. Thurmon, 368 F.3d 848, 851 (8th Cir. 2004) (internal marks omitted).

Hyles argues that he was prejudiced by the district court's denial of a continuance because his counsel's trial preparation time was sacrificed in order to review the recordings. He argues that counsel could have missed exculpatory

evidence that was buried somewhere in the conversations.[2] Hyles also argues that the rush to review even the limited number of conversations designated by the government disrupted the preparation that is required in the weeks before a capital trial. The district court denied the lengthy continuance Hyles had requested, but it stated that a short recess could be granted during trial if the government decided to use any of the recordings. Ultimately, none of the recorded conversations were used as evidence during trial.

The government argues that our decision in United States v. Hernandez, 299 F.3d 984 (8th Cir. 2002), is "[p]articularly instructive," and we agree. In Hernandez, the government notified defense counsel four days before trial that it would be calling a particular expert witness. At trial, however, the government never called the witness. The government did not notify the defense about this decision until "late into the trial." Id. at 991. Like Hyles, Hernandez argued that despite the fact that the witness never testified, "he was prejudiced by having to sacrifice defense counsel's valuable trial preparation time to prepare for that witness." Id. at 991-92. Our court disagreed, holding that Hernandez failed to show actual prejudice; thus, the denial of his motion to continue did not amount to an abuse of discretion. Hernandez was not prejudiced because he did not show "what would have been done but for the false start, nor how such omission would have led to a different result." Id. at 992.

Likewise, Hyles does not point to anything specific that would have been done if not for the late arrival of the recorded conversations, nor does he argue that, if the continuance had been granted, the result of the trial would have been different.

---

[2]To the extent Hyles intended to present an argument under Brady v. Maryland, 373 U.S. 83 (1963), such an argument fails. He had access to the CDs and has identified no exculpatory content.

Hyles has failed to show actual prejudice; therefore, we affirm the district court's decision to deny Hyles's motion for a continuance.[3]

### C.    Admission of Writings on the Photographs

Hyles next argues that the district court abused its discretion when it admitted writings on the back of photographs of the Pontiac and Hyles and Cannon into evidence over Hyles's foundational and hearsay objections. Hyles argues that there was no foundation for the admission of the writings because the government did not offer evidence as to when the writings took place, who wrote them, and whether Cannon and Hyles knew about the writings. Alternatively, Hyles argues that the writings are inadmissible hearsay. We review the district court's evidentiary ruling for clear abuse of discretion, United States v. Chase, 451 F.3d 474, 479 (8th Cir. 2006), and will not reverse if the error was harmless. United States v. Jara, 474 F.3d 1018, 1022 (8th Cir. 2007).

Regarding Hyles's argument as to foundation, Federal Rule of Evidence 901 requires authentication or identification before evidence can be admitted. This rule is satisfied by providing "evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed. R. Evid. 901(a). We have said that under this standard, the party "need only demonstrate a rational basis for its claim that the evidence is what the proponent asserts it to be." United States v. Coohey, 11 F.3d 97, 99 (8th Cir. 1993).

---

[3]Hyles also argues that the district court's denial of his motion to continue violated his Due Process rights. Because the denial of the motion was not arbitrary within the circumstances of this case, his argument has no merit. See United States v. Bernhardt, 642 F.2d 251, 252 (8th Cir. 1981) (per curiam) ("The determination of whether a denial of a continuance is arbitrary enough to violate due process depends on the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied.") (internal marks omitted).

The government offered the picture of the Pontiac Parisienne and the writing on the back of that picture to demonstrate the importance of the car to Cannon. According to the government, the car was important enough to Cannon that he kept a picture of it with him in jail. The pictures of Cannon and Hyles together with writing on the back were offered to prove their close relationship. As the government stated at trial, "this is a conspiracy case and [the pictures and writings] establish[] a[n] association between" the two. The government expressly stated at trial that it did not matter who put the writing on the back of the pictures.

Keeping in mind the limited purpose the government had for offering the photographs and writings, there was sufficient foundation. The deputy who seized the photographs from Cannon's property at the jail testified that he saw the writing on the back when he seized them. Other officers identified Hyles and Cannon as the people pictured in the photographs, and the car as the same car they had seen Cannon and Tonya driving. The government demonstrated a rational basis for its claim that the pictures were of Cannon and Hyles, that the car was the Pontiac Parisienne, and that the writings shed light on the relationship between the co-conspirators. The district court did not abuse its discretion when it admitted the pictures and writings over Hyles's objection as to foundation.

Regarding Hyles's hearsay argument, we agree with the government that the writings on the pictures are not hearsay. Federal Rule of Evidence 801 defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Hyles did not object to the pictures themselves; he objected only to what was written on the reverse. On the back of the picture of the Pontiac was written "Da-Pony G' 'Ride.'" The two pictures of Hyles and Cannon had "'2' of Da Most Wanted" and "'Bo$$' playa's, 2-Da-Casket ↓" written on the back, respectively. The government offered the writings on the back of the photographs as evidence of the importance of the

-16-

Pontiac to Cannon, and to show Hyles's association with Cannon in the conspiracy case. The writings were not offered to prove that Hyles was a "Boss Playa" or one of the "Most Wanted." There is no suggestion that the jury was told what these phrases mean. Indeed, it is the fact that there is writing on the back of these pictures and that Hyles and Cannon found the pictures important enough to write on that makes them important; what exactly was written on them does not matter. See United States v. Wilson, 532 F.2d 641, 646 (8th Cir. 1976) ("It is the fact that the statements were written, and not the truth of the statements, which was relevant.") Therefore, they are not hearsay, and were properly admitted into evidence.

Even if the writings were offered for their truth, we would not reverse because any error is harmless. The government presented ample evidence at trial that demonstrated the close relationship between Hyles and Cannon, including admissions by Hyles in his videotaped statement that he had talked to Cannon several times on the telephone before Smith was murdered, that Cannon was Hyles's "partner," and that Hyles and Cannon were "cool" and had been "friends for a long time." Any error here would not be reversible error.

> D. Exclusion of Recorded Phone Conversations Between Amesheo Cannon and April Leatherwood

Hyles argues that the district court erred when it excluded prior inconsistent statements offered by Hyles to impeach April Leatherwood. Federal Rule of Evidence 613(b) "provides that extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless: (1) the witness is afforded an opportunity to explain or deny the statement and the opposing party is afforded an opportunity to interrogate the witness about the statement or (2) the interests of justice otherwise require." United States v. Schnapp, 322 F.3d 564, 571 (8th Cir. 2003). The district court excluded the recorded conversations between Leatherwood and Cannon because Leatherwood was not given the opportunity to explain or deny the conversations as

required by Rule 613(b). Although Leatherwood had testified, she was no longer in the courtroom when Hyles sought to introduce her prior statements. Further, while Leatherwood was still under subpoena, the district court stated that it would deny defendant's request to bring her back because the evidence would be cumulative under Federal Rule of Evidence 403.

The district court's Rule 403 concerns were warranted. Rule 403 allows the court to exclude relevant evidence "if its probative value is substantially outweighed by . . . needless presentation of cumulative evidence." Leatherwood had already proven herself untrustworthy. She admitted on cross-examination that everything she told Cannon's investigators was false. The district court was well within its discretion to determine that admission of Leatherwood's prior inconsistent statements would be cumulative, see Fed. R. Evid. 403; United States v. Sutton, 41 F.3d 1257, 1260 (8th Cir. 1994) (holding that recalling a witness to allow her to explain or deny a prior inconsistent statement "is not mandatory, but is optional at the trial judge's discretion"), and that "the interests of justice" did not "otherwise require" the admission of the statements.

Hyles also argues that his Sixth Amendment right to present witnesses on his behalf was violated by the exclusion of Leatherwood's prior statements. Hyles's Sixth Amendment rights were not violated. In the context of evidentiary exclusions, a defendant's Sixth Amendment rights are only violated "where the trial court excludes relevant evidence without sufficient justification." Bernhardt, 642 F.2d at 253. The district court's determination that admission of the recorded conversations would be cumulative is sufficient justification.

E.     Admission of Amesheo Cannon's Statements

Hyles next argues that the district court erred in admitting several statements made by his co-conspirator, Cannon. The district court's discretion to admit evidence

over a hearsay objection is "particularly broad in a conspiracy trial." United States v. McKay, 431 F.3d 1085, 1093 (8th Cir. 2005) (internal quotation omitted). We will reverse only if the district court's ruling was a "clear and prejudicial abuse of discretion." United States v. Haskell, 468 F.3d 1064, 1072 (8th Cir. 2006).

i.      Testimony of Omar Wiley

At trial, Omar Wiley testified that: (1) Cannon told him before the murder that he intended to kill Coy Smith, and that (2) after the murder he observed Cannon and Tonya arguing about the Pontiac. Hyles argues that these statements are inadmissible hearsay and should have been excluded. We disagree. Cannon's statement that he planned or intended to kill Smith is admissible as his "then existing state of mind . . . (such as intent, plan, motive, design . . .)" pursuant to Federal Rule of Evidence 803(3). Such statements "are not excluded by the hearsay rule." Fed. R. Evid. 803. Wiley's testimony that Cannon wanted the car and that Wiley had witnessed an argument regarding the ownership of the car is not hearsay because it is not an assertion by either Cannon or Tonya. See Fed. R. Evid. 801(a). The district court did not error when it admitted these statements.

ii.     Testimony of Captain Tony Jones

Caruthersville Police Department Captain Tony Jones testified regarding a conversation he had with Cannon one week after the murder of Smith. After pulling Cannon over for running a stop sign, Jones asked Cannon "to stop threatening Tonya Hyles over Tyrese Hyles's vehicle," and told Cannon "that the vehicle was marital property and she did not have to give him the vehicle." Cannon told Jones that "Tyrese had told him he could have the vehicle." Hyles argues that Cannon's statement is inadmissible hearsay. The government argues the statement was properly admitted as a co-conspirator statement in furtherance of the conspiracy. While we have serious concerns as to whether Cannon's statement actually was in furtherance

-19-

of the conspiracy to murder Smith in exchange for the Pontiac, we need not address this issue.

Even if it was error to allow the statement into evidence, we find that any error is not prejudicial. The government presented additional evidence linking Cannon and the Pontiac to the conspiracy, including the fact that Cannon was seen by several witnesses driving the car, the fact that Tonya had used the Pontiac as collateral when bailing David Carter out of jail, Wiley's observation of a fight between Tonya and Cannon over the car, Jones's recollection of his own statements, and the picture of the Pontiac in Cannon's jail cell. Hyles has not convinced us that the outcome of his trial would have been different if not for the admission of Cannon's statement.

F.      Cross Examination of Hyles's Former Attorney

Finally, Hyles argues that the district court erred by allowing the government to ask Hyles's former attorney questions during cross examination. Hyles contends that this violated his attorney-client privilege. This argument has no merit. By calling his former attorney from his underlying state drug case as a witness and asking the attorney about discussions with Hyles, Hyles waived his privilege. See United States v. Workman, 138 F.3d 1261, 1263 (8th Cir. 1998) ("Voluntary disclosure of attorney client communications expressly waives the privilege."). Further, the government agreed to limit its inquiry on cross-examination to facts known to the attorney "from any source." See Upjohn Co. v. United States, 449 U.S. 383, 395-96 ("The protection of the privilege extends only to *communications* and not to facts. A fact is one thing and a communication concerning that fact is an entirely different thing.") (internal marks omitted). The district court did not abuse its discretion.

III.    Conclusion

For the foregoing reasons, we affirm the judgment of the district court.

_____