# United States Court of Appeals
## For the Eighth Circuit

_____

No. 23-1473

_____

United States of America

*Plaintiff - Appellee*

v.

James Timothy Norman

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: January 10, 2024
Filed: July 9, 2024

_____

Before BENTON, ERICKSON, and KOBES, Circuit Judges.

_____

KOBES, Circuit Judge.

James "Tim" Norman orchestrated the murder of his nephew and then tried to cash in on a fraudulent insurance policy on his life. A jury convicted Norman of conspiring to commit murder for hire and murder for hire, 18 U.S.C. § 1958, and of

conspiring to commit mail and wire fraud, §§ 1349, 1341, 1343. He appeals, challenging several of the district court's[1] trial rulings. We affirm.

## I.

Andre Montgomery was going nowhere fast in Texas when his uncle invited him back to St. Louis to "teach him how to be a man." Norman set Andre up in a nice apartment, put him in music school, and got him a job at the family restaurant, Sweetie Pie's—the subject of a reality TV show. But his goals were not altogether noble. Norman also worked with insurance agent Waiel Yaghnam to apply for several life insurance policies on Andre. He wanted them quickly and without his nephew's involvement or knowledge. Only one went through, and it set Norman up for a $450,000 payout on Andre's death.

It soon became clear that Norman's lessons in manhood weren't going to plan. Andre dropped out of school, stopped showing up to work, and left his apartment. Things came to a head in June 2015 when someone broke into the home of Robbie Montgomery, matriarch and owner of Sweetie Pie's. Robbie suspected her grandson Andre and wanted him to take a polygraph to prove his innocence. But fearing that Norman was after him, he had skipped town.

In September, Yaghnam peddled a new life insurance policy with one catch: Norman had to wait six months before he could be listed as the policyowner. Norman was not interested because Andre "might not make it six months." Yaghnam kept pestering him to call the insurance companies for recorded interviews, but Norman didn't want to be on tape. "[S]hit has changed," he wrote, and Andre "ain't gonna be around much longer."

---

[1]The Honorable John A. Ross, United States District Judge for the Eastern District of Missouri.

-2-

When Andre resurfaced the next spring in St. Louis, it was time for Norman to cash in on the life insurance policy. But by this point, Norman was living in Los Angeles. Enter Travell Hill, the hired gun, and Chris Carroll, Norman's man on the ground in St. Louis. Weeks before the murder, Hill and Carroll met to discuss Hill's fee, and Carroll told him that he was asking for too much money to kill Andre. When Andre showed up at Sweetie Pie's, Carroll and a security guard texted Norman about his return. Norman flew to St. Louis a week later. He met with Hill the next day and asked if he had talked to Carroll—a question Hill interpreted as confirmation that Norman wanted him to kill Andre.

Hill bought a gun. That same day, Norman invited Terica Ellis to his hotel. He told her that he was looking for Andre, and she agreed to find him. Norman gave her $10,000. Communications then volleyed between Ellis and Andre and among Ellis, Hill, and Norman. Ellis pinned Andre down after a few hours and, on Hill's orders, got him in her car. He left a few moments later, and Ellis saw a text from Hill: "Move." Shots rang out as she sped off, and Andre was dead.

## II.

Norman first challenges the denial of his motions to compel Carroll and Yaghnam's testimony at trial. The Sixth Amendment guarantees an accused's right to compulsory process of favorable witnesses. That right meets its limit in another: the witness's Fifth Amendment privilege against compelled self-incrimination. Both Carroll and Yaghnam asserted their privilege and refused to testify, but Norman argues that they both waived the Fifth Amendment privilege and that in any case, neither risked further incrimination.

The district court found that Carroll and Yaghnam's claims of the privilege were valid. We review these "highly fact-intensive" decisions for abuse of discretion. *United States v. Allmon*, 594 F.3d 981, 984–85 (8th Cir. 2010). The court's discretion is bolstered by common sense given "this necessarily difficult subject." *Mason v. United States*, 244 U.S. 362, 366 (1917).

-3-

## A.

Norman insists that Carroll "clearly waived his Fifth Amendment rights" by submitting to hours of FBI questioning about the murder. True, "a witness, *in a single proceeding*, may not testify voluntarily about a subject and then invoke the privilege against self-incrimination when questioned about the details." *Mitchell v. United States*, 526 U.S. 314, 321 (1999) (emphasis added). But testimonial waiver does not stretch from one proceeding to another. *Allmon*, 594 F.3d at 985; *United States v. Burch*, 490 F.2d 1300, 1303 (8th Cir. 1974). And Carroll did not even testify in another "proceeding." His unsworn, out-of-court statements to police did not waive his Fifth Amendment privilege. *Burch*, 490 F.2d at 1303.

So the privilege was still Carroll's to claim. But it was for the district court to decide whether he faced jeopardy. To sustain the privilege under these circumstances, the court only needed to consider whether the witness had "reasonable cause to apprehend danger from a direct answer." *Hoffman v. United States*, 341 U.S. 479, 486 (1951). But the risk of prosecution must be real—the Fifth Amendment's protections do not extend to "remote and speculative possibilities," unsubstantial danger, or "merely trifling or imaginary[] hazards of incrimination." *In re Grand Jury Proc.: Samuelson*, 763 F.2d 321, 323–24 (8th Cir. 1985) (first quoting *Zicarelli v. N.J. State Comm'n of Investigation*, 406 U.S. 472, 478 (1972); and then quoting *Marchetti v. United States*, 390 U.S. 39, 53 (1968)).

Carroll faced real danger by testifying. If forced to tell his story under oath, it might differ from the one he gave the FBI. And the truth could "furnish a link in the chain of evidence needed to prosecute" him. *Hoffman*, 341 U.S. at 486. Even an answer consistent with his previous interview could land Carroll in hot water, as the "mere repetition on oath of the same facts would of itself, as corroborative evidence, tend to criminate." *Cullen v. Commonwealth*, 65 Va. (24 Gratt.) 624, 637 (1873). And his compelled testimony could have "independent incriminating value" if he were prosecuted and successfully suppressed the statements to the FBI. *Burch*, 490 F.2d at 1303.

-4-

Still, Norman criticizes the court's process. He says it failed to "scrutinize" Carroll's "good faith basis" for asserting the privilege. We disagree. "[I]t need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result." *Hoffman*, 341 U.S. at 486–87. And courts must sustain the privilege unless it is "*perfectly clear*, from a careful consideration of all the circumstances in the case, that the witness is mistaken" and his answers "'*cannot possibly* have such a tendency' to incriminate." *Id.* at 488 (quoting *Temple v. Commonwealth*, 75 Va. 892, 898 (1881)); *see also United States v. Campbell*, 410 F.3d 456, 463 (8th Cir. 2005). If an answer "may or may not criminate the witness," and the witness says "upon his oath that his answer would criminate himself," then "the court can demand no other testimony of the fact." *United States v. Burr*, 25 F. Cas. 38, 40 (C.C.D. Va. 1807) (Marshall, C.J.).

Carroll took the stand outside the presence of the jury and refused to answer questions about his association with Sweetie Pie's and the major players in this case: Norman, Robbie, Hill, and Andre. He confirmed that he would not testify about any related issues. Based on the questions and the trial testimony up to that point, the court found that Carroll faced jeopardy and denied the motion to compel. Its considered decision was proper and far from the "blind[] accept[ance]" of a "blanket invocation" Norman portrays it to be.

B.

Yaghnam's challenge is easier to resolve. He never took the stand—instead, his lawyer told the court that Yaghnam had not been subpoenaed and that regardless, he intended to assert his privilege if called. Norman argues that the district court abused its discretion by refusing to compel Yaghnam to appear and assert his Fifth Amendment privilege in person.

It is "beyond controversy that one of the duties which the citizen owes to his government is to support the administration of justice by attending its courts and giving his testimony *whenever he is properly summoned*." *Blackmer v. United States*, 284 U.S. 421, 438 (1932) (emphasis added). That duty is in turn "measured by the subpoena, the only process under which [one] could be required to appear and testify at all." *Loubriel v. United States*, 9 F.2d 807, 809 (2d Cir. 1926). Norman does not dispute that he failed to serve a subpoena. *See* Fed. R. Crim. P. 17. Without a properly served subpoena, Yaghnam had no duty to appear in court, and Norman's Sixth Amendment argument fails. *See Taylor v. Illinois*, 484 U.S. 400, 415 (1988) (requiring "affirmative conduct" like "the serving of subpoenas" to invoke the right to compulsory process).

## III.

Norman next faults the district court for admitting hearsay texts from Andre and an out-of-court statement from Carroll. We review for a "clear and prejudicial abuse of discretion." *United States v. Hyles*, 479 F.3d 958, 970 (8th Cir. 2007) (citation omitted).

## A.

After the break-in, Andre texted Robbie to explain that he could not take a polygraph to clear his name because he'd left town: "I been out of town cuz yu don't believe me n I'm not bout to get hurt from nobody for sum shit I didn't do . . . I'm telling yu know TIM IS AFTER ME," and later, "I'm not just bout to be sitting in STL wen I know Tim got people looking for me." The district court admitted the messages into evidence, reasoning that they showed that Andre's then-existing state of mind was fear of Norman. *See* Fed. R. Evid. 803(3).[2]

---

[2]Norman complains that the Government exceeded the narrow Rule 803(3) purpose by arguing at closing that Andre feared Norman had people after him "and he was right." He did not object to the statement and does not now argue that it was

Norman counters that the messages were irrelevant and prejudicial. We disagree. The messages helped explain why Norman could not act sooner and had to enlist others in his plot—Andre was steering clear of St. Louis and needed to be flushed out. They also rebutted Norman's defense that Andre knew about the insurance applications he submitted after the break-in—the two were not likely to have discussed the policies while Andre was afraid of Norman and avoiding him. And in any case, Norman has not shown that a danger of *unfair* prejudice substantially outweighed this probative value. *See* Fed. R. Evid. 403; *United States v. Medearis*, 65 F.4th 981, 986 (8th Cir. 2023) ("Unfair prejudice means an undue tendency to decide a case on an improper basis." (cleaned up) (citation omitted)).

Norman also argues that the messages lacked proper foundation. He points to Federal Rule of Evidence 602's requirement that a witness have "personal knowledge of the matter" to which he testifies. But the "matter" under Rule 803(3) is not whether Norman was in fact after Andre such that his fears were justified; it is Andre's "then-existing state of mind." Surely Andre had personal knowledge of his own mind. Norman does not suggest that the messages lacked authenticity or the "circumstantial guarantee of trustworthiness" governing admissibility under this hearsay exception: "substantial contemporaneity of event and statement." *See United States v. Dierks*, 978 F.3d 585, 593 (8th Cir. 2020) (cleaned up) (citation omitted).

B.

We reach the same result with Carroll's statement, elicited during Hill's testimony, that Hill "was charging Tim too much . . . to murder Andre." The court found that Carroll was a member of the murder-for-hire conspiracy and that he made the statement in furtherance of the conspiracy, so it admitted the statement as non-

---

"plainly unwarranted and clearly injurious." *United States v. Oslund*, 453 F.3d 1048, 1059 (8th Cir. 2006). So there is no reversible error.

hearsay under Rule 801(d)(2)(E).[3]  *See United States v. Bell*, 573 F.2d 1040, 1043 (8th Cir. 1978) (discussing admissibility).  Norman argues that it was inadmissible because the only proof of Carroll's membership was the disputed statement itself, which could not alone establish his participation in the conspiracy.

Norman gets the rule right but the record wrong.  There was ample evidence of Carroll's involvement in the conspiracy.  Hill testified that he met with Carroll and said that Norman could give him anything he wanted to for the task.  On the day of the murder, Carroll picked Norman up from the airport, and Norman sent him photos from Andre's Instagram.  Norman saw Hill and asked if he had talked to Carroll, which gave Hill the impression that Norman wanted him "to go kill Andre."  He then bought the gun he used hours later to do just that.

## IV.

Norman also argues that the district court should not have allowed FBI agents to use two demonstrative exhibits, or pedagogic devices, that summarized evidence while they testified at trial.  There are two paths for presenting summary material: as evidence to prove its content, *see* Fed. R. Evid. 1006, or as an illustrative aid to organize evidence for the jury, *see United States v. King*, 616 F.2d 1034, 1041 (8th Cir. 1980); *United States v. Fechner*, 952 F.3d 954, 959–60 (8th Cir. 2020).  The Government took the second route.  Our review of the court's decision to receive the illustrative aids is limited to whether they were "so unfair and misleading as to require a reversal." *Fechner*, 952 F.3d at 960 (citation omitted).

---

[3]Norman claims that the statement was "particularly prejudicial" and should have been struck because the court refused to compel Carroll's testimony.  But the ruling is on no shakier ground by virtue of Carroll's absence. *See United States v. Reyes*, 362 F.3d 536, 542 (8th Cir. 2004) ("[W]hen a statement is admissible as a co-conspirator statement, the Constitution gives the defendant, *at most*, the right to confront the witness who recounts the statement." (emphasis added)).

One contested set of slides summarized inconsistencies in the insurance policy applications and put them in context with Norman and Yaghnam's texts. Another synthesized phone and bank records to help jurors understand the timeline of the murder. Neither was offered as evidence, the court instructed the jury to that effect, and the slides were not provided to the jury during deliberations. *See United States v. Possick*, 849 F.2d 332, 339 (8th Cir. 1988). The exhibits "merely provided a visual aid during [the agents'] testimony," *Fechner*, 952 F.3d at 960, and they were "straightforward and accurate," *Possick*, 849 F.2d at 339; *cf. United States v. Hawkins*, 796 F.3d 843, 866 & n.18 (8th Cir. 2015). Because there was nothing unfair or misleading about the illustrative slides, the district court did not abuse its discretion.

V.

Only Norman's challenges to the final and supplemental jury instructions remain. But he has waived the former by jointly proposing the instructions and failing to object. *United States v. Tillman*, 765 F.3d 831, 836 (8th Cir. 2014). And we see no abuse of the court's "substantial discretion" in the latter. *United States v. Stevenson*, 979 F.3d 618, 625 (8th Cir. 2020).

During deliberations, the jury requested clarification on Instruction No. 22, which told the jury that Hill and Ellis were cooperating witnesses who "participated in the crime charged" and hoped to receive sentence reductions. It further charged the jury with deciding the weight of their testimony in light of their cooperation. The jury asked about a third witness, who was not named in the instruction. Norman wanted a supplemental instruction that identified the witness as a cooperator, but the Government resisted, arguing that he was unlike Hill and Ellis—he was not charged, and whatever the nature of his cooperation agreement, it did not promise leniency at sentencing.

As is "often a proper response," the court referred the jury back to the final instructions. *Stevenson*, 979 F.3d at 625. There was no evidence indicating that the

Government agreed to seek a reduced sentence in exchange for the witness's cooperation, so Norman's preferred instruction would have been inaccurate. *Cf. United States v. Tremusini*, 688 F.3d 547, 557 (8th Cir. 2012) (finding that the district court "properly declined" to give a similar instruction absent an agreement for leniency). Plus, another instruction covered the substance of Norman's complaint by advising the jury to consider "any motives [a] witness may have for testifying a certain way." The court's supplemental jury instruction offers Norman no reprieve. *See United States v. Maupin*, 3 F.4th 1009, 1014–15 (8th Cir. 2021).

## VI.

We affirm the district court's judgment.

_____